### SOUTHEASTERN AIRWAYS CORPORATION

v.

### The UNITED STATES.

No. 552–79C.

United States Court of Claims.

Feb. 24, 1982.

Carleton P. Ketcham, Jr., Birmingham, Ala., attorney of record, for plaintiff; Dominick, Fletcher, Yeilding, Acker, Wood & Lloyd, P. A., Birmingham, Ala., of counsel.

Robert G. Giertz with whom was Asst. Atty. Gen., Alice Daniel, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, SKELTON, Senior Judge, and NICHOLS, Judge.

## ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

### OPINION

PER CURIAM:

This case comes before the court on plaintiff's request for review of the recommended decision of Trial Judge Louis Spector filed March 27, 1981, pursuant to Rule 166 having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof since the court agrees with the trial judge's recommended decision as hereinafter set forth, it hereby adopts that decision as the basis for its judgment in this case. Therefore, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, judgment is entered in favor of defendant on its counterclaim in the amount of $25,862.98, and the petition is dismissed.

### OPINION OF TRIAL JUDGE

SPECTOR, Trial Judge:

### INTRODUCTION

This is an action alleging breach of two contracts on the grounds that their termination by defendant, acting through the United States Postal Service, was "in violation of the due process clause and equal protection clause of the Fourteenth Amendment of the Constitution of the United States."[1] The contracts contain a clause on "Disputes"[2] contemplating that "any dispute concerning a question of fact * * * shall be decided by the Contracting Officer" whose decision shall be final unless appealed to the Postmaster General, whose decision (or that of his duly authorized representative) shall be final—

unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence.

The clause—

does not preclude consideration. of law questions * * * provided, that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

Plaintiff was afforded an opportunity to be heard and to offer evidence in support of appeals from adverse decisions of the contracting officer, by the Board of Contract Appeals representing the Postmaster General in these matters. Therefore, the petition herein also alleges in the alternative that the decision of the board is "not based on substantial evidence" and is "contrary to law." Plaintiff has in fact moved for review of the board decision under our Rule 163(b)(2)[3] and the parties have briefed the case under that and related rules. This decision will, therefore, proceed as a review of the board's prior decision, measured against the standards of review set forth in the "Disputes" clause and the Wunderlich Act.[4]

### FACTS

The facts hereinafter related, are taken from the board opinion and are not seriously in dispute.[5] Plaintiff corporation is owned by Clark E. Hovis and was operated by him and his wife.[6] In August and September of 1974, plaintiff submitted bids on four air taxi mail service contracts to be

---

1. Plaintiff seeks judgment "in the sum of Five Hundred Thousand Dollars ($500,000), interest and costs" on each contract.

2. The language in the "Disputes" clause is mandated by the so-called Wunderlich Act, 41 U.S.C. §§ 321–22.

3. Which applies "to cases founded on contracts containing disputes clauses * * *." Ct.Cl. Rule 161.

4. See note 2, supra.

5. Defendant's counsel adopts the factual statement in the board's opinion. Plaintiff's counsel

recites the facts differently in some respects, but the differences are largely in emphasis or articulation. To the extent that those differences may be regarded as substantive and material, the facts herein recited are supported by substantial evidence in the board record under review.

6. As a result of the events hereinafter related, the corporation has not been active since September 1975, and it no longer maintains a place of business.

awarded by the Postal Service. It was low bidder on all four. An air transportation officer, C. E. Rands, visited plaintiff at Double Springs, Alabama, on November 5, 1974, to meet Mr. and Mrs. Hovis and to conduct a pre-award survey. Mr. Hovis agreed that all four contracts were beyond the corporation's capabilities and that he had never intended to take all four, but he stated he could successfully handle two of them, namely, the Detroit—St. Louis and Detroit—Nashville routes. This would provide the efficiencies of a common port at Detroit, plus a short flight from Nashville to his home base at Double Springs, Alabama, for maintenance and repairs.

There are some contradictions in the testimony as to the circumstances under which this proposal by Mr. Hovis was rejected by Mr. Rands. Mrs. Hovis testified that Mr. Rands wanted them to take the Chicago—Omaha route, and if not accepted plaintiff could not have any contract at all. This last proviso is denied by Mr. Rands. Mr. Rands is also reported to have said that it was easier for the Postal Service to give a new operator a route and then bankrupt him, than it was to deny him a route. He admits that general statements to that effect may have been made but denies they were specifically directed at plaintiff as a threat. Mr. Rands is also quoted without contradiction, as having stated that plaintiff could not have the Detroit—St. Louis route because the Postal Service was well satisfied with the current contractor.[7] In any event, contracts were entered into with plaintiff for the Chicago—Omaha and the Detroit—Nashville routes for a period of 4 years.

At this November 5, 1974 meeting and in telephone conversations thereafter, it was apparent that plaintiff was having difficulty acquiring the necessary airplanes and was seeking an extension of the commencement date scheduled for December 2, 1974. Mr. Rands insisted on that date, or plaintiff would lose the contracts. Plaintiff purchased four of the required aircraft from SEMO Aviation, an existing contractor in the Central Postal Region. Although Mr. Hovis conditioned the purchase upon the aircraft having had fresh annual inspections before delivery, and upon actual delivery by November 30, 1974, they were not in fact delivered until the evening of December 2, 1974, when service was scheduled to begin.

A number of problems grew out of this late delivery. Plaintiff could not test-fly the aircraft prior to beginning performance; it could not check-ride its pilots in the planes; it could not develop and commence its maintenance program; and it could not confirm whether or not the airplanes had in fact received fresh annual inspections.

Performance is evaluated by the Postal Service in 4-week cycles, corresponding with its accounting periods for these air taxi mail contracts. *Except for weather or other causes beyond the control of the contractor*, the minimum level of acceptable performance is 96 percent. Plaintiff operated only 5 days in the first accounting period ending December 6, 1974, and achieved a rating of 83.3 percent on the Detroit—Nashville route and 90 percent on the Chicago—Omaha route, ratings which are understandable in view of the circumstances prevailing during the startup of service on December 2nd. In any event, these early ratings were not relevant to the events which followed.

Plaintiff thereafter operated the Chicago—Omaha route until about August 18, 1975, achieving the following performance ratings:

|     |                 |   |             | *Percent* |
|-----|-----------------|---|-------------|-----------|
| (1) | 12–07–74        | – | 1–03–75     | 100       |
| (2) | 1–04–75         | – | 1–31–75     | 86.3      |
| (3) | 2–01–75         | – | 2–28–75     | 90.8      |
| (4) | 3–01–75         | – | 3–28–75     | 92.5      |
| (5) | 3–29–75         | – | 4–25–75     | 93        |
| (6) | 4–26–75         | – | 5–23–75     | 100       |
| (7) | 5–20–75         | – | 6–24–75     | 100       |
| (8) | 6–21–75         | – | 7–18–75     | 97.2      |
| (9) | 7–19–75         | – | 8–15–75     | 90        |

As later discussed in greater detail, plaintiff was advised on or about August 18,

---

7. Although plaintiff was low bidder on all four   routes advertised, including Detroit—St. Louis.

1975 that its contract for the Chicago—Omaha route was "as good as terminated"[8] because of a failure to perform for the prior 3 days. During the last accounting period above tabulated when plaintiff achieved a rating of 90 percent, one of its aircraft had been grounded by the FAA in Des Moines, Iowa, for lack of a repair part and a second aircraft had been unlawfully detained under circumstances which plaintiff characterizes as a "theft".

On the Detroit—Nashville route, the plaintiff achieved the following performance ratings during the equivalent period:

|     |                      | Percent |
| --- | -------------------- | ------- |
| (1) | 12–07–74 – 1–03–75   | 97.1    |
| (2) | 1–04–75 – 1–31–75    | 90      |
| (3) | 2–01–75 – 2–28–75    | 93      |
| (4) | 3–01–75 – 3–28–75    | 100     |
| (5) | 3–29–75 – 4–25–75    | 100     |
| (6) | 4–26–75 – 5–23–75    | 97      |
| (7) | 5–20–75 – 6–24–75    | 89      |
| (8) | 6–21–75 – 7–18–75    | 99.1    |
| (9) | 7–19–75 – 8–15–75    | 90      |

When difficulties occurred on the Chicago—Omaha route, defendant stopped payments on that contract, but it also stopped payments on the contract for the Detroit—Nashville route. As a result, plaintiff could no longer purchase fuel and the Detroit—Nashville contract was terminated on September 9, 1975.

There were mechanical problems with all the aircraft purchased from SEMO Aviation during the period the contracts were in effect. Plaintiff was obliged to purchase other planes, and to rent planes at great expense when the aircraft purchased from SEMO would not fly. The cost of rental aircraft greatly exceeded the gross revenue to be earned by the rented aircraft on a mail route. Plaintiff was also confronted with skyrocketing fuel costs and by increased landing ramp fees at airports. Another financial problem resulted from the expense of airworthiness directives issued by the FAA after these two contracts had been awarded.

Two incidents are highlighted in the record as having precipitated termination of the Chicago—Omaha contract, followed by its "domino" effect upon the Detroit—Nashville contract. On or about August 13, 1975, one of the aircraft on the Chicago—Omaha route needed maintenance in Des Moines as earlier mentioned. An FAA-licensed mechanic determined that the bell crank pulley which services one of the elevator trim tabs, was worn to the point of breaking. He would not release the airplane to service and certify it as airworthy without replacing the part. Discovery of the defect was at night and the part was unavailable. As a result, the aircraft was out of service for 2 days.

Unfortunately, just as that aircraft was released to service, the other plane on the Chicago—Omaha route became unavailable under the following bizarre circumstances. Upon the completion of a flight to Omaha, the pilot parked the aircraft on a public ramp of the Omaha Municipal Airport. All local fees to the airport had been paid and there were no unpaid service bills. The pilot got out of the plane, locked it and left. At some prior time, there had been a technical misunderstanding between plaintiff's fuel supplier at Omaha and Phillips Petroleum, from which the supplier purchased his fuel. Phillips had sent back plaintiff's credit slips for purchased fuel for lack of an authorization number on the slips.[9] The fuel supplier caused plaintiff's aircraft to be pulled into his hangar and refused to surrender it to plaintiff. This is referred to as the stolen plane incident. As the result of these two incidents, there was no service on the Chicago—Omaha route on August 14, 15 and 18–22.

Under a clause entitled "Adjustment of Compensation," plaintiff could request an adjustment in contract price for, *inter alia*, increased operating costs such as fuel, landing ramp fees, and compliance with FAA airworthiness directives not in effect at the time the contracts were awarded. During

---

**8.** The quote is from the board opinion.

**9.** Plaintiff had been using the same procedure for some time.

the pre-award survey by Mr. Rands at Double Springs, Alabama, he advised Mr. Hovis that his bid forms were not properly broken down as to fuel costs if he expected later to apply for contract adjustments for increased operating costs.[10] The deficiencies cited were corrected in a new bid form submitted to Mr. Rands.

In February of 1975, Mr. and Mrs. Hovis, accompanied by their accountant, went to Chicago to discuss the unsatisfactory level of service being achieved on the Chicago—Omaha route. At the conclusion of that meeting, discussion turned to the proper method of requesting adjustment of compensation. Proper forms were prepared by the accountant and submitted to Mr. Rands at a second meeting that same month. On that occasion, Mr. Rands produced from his files *the original and uncorrected* bid forms on which fuel costs had not been properly broken, down. The request for contract price adjustment was then and there turned down, and Mr. Rands stated that additional material was needed to properly document the request. The additional material requested included letters from suppliers stating the price per gallon of fuel at commencement of the contracts, and the price at the date of the request for price increase. Some of the suppliers would not or could not readily supply the information. After assembling the material, plaintiff resubmitted its increase request as a package to Mr. Rands by mail, postage prepaid, on June 19, 1975. The testimony shows it was never received and that Mr. Hovis checked with Mr. Rands a couple of times but it was not there. No action was therefore ever taken on the request.

When the "stolen plane" incident occurred as earlier described, a backup plane was in the shop undergoing repairs and was unavailable to replace one of the regular planes on the Chicago—Omaha route. Mr.

Rands asked plaintiff to rent a replacement. As previously indicated, the cost of rental greatly exceeded the gross revenue to be earned by the rented aircraft, and plaintiff lacked the necessary funds due in part to increased fuel costs, landing ramp fees and the cost of compliance with airworthiness directives which had not been reimbursed. The board opinion states that if plaintiff—

had perfected its rate increase requests and if [it] had been granted the rate increase it sought, conceivably it would have had the money to rent an airplane until the repairs on the back-up airplane were completed or until the detained Omaha airplane was recovered. Despite [plaintiff's] need for funds, and although at different times after June 19, 1975, Mrs. Hovis discussed with Mr. Rands the rate increase request mailed on that date, no copy or substitute original of the forms documenting the justification for such an increase was ever sent to the appropriate office in Chicago.

After plaintiff was advised by telephone that its Chicago—Omaha contract was "as good as terminated,"[11] it asked to be released from that contract on grounds of hardship, and went to a meeting in Chicago on August 25, 1975 to see if that contract could be saved.[12] Prior to the meeting, Mr. Rands met with his superior and thereafter prepared a memorandum in which he used the word "release" to describe the instructions given him with respect to plaintiff and the Chicago—Omaha contract. In other conversations and letters the words "terminate" or "cancel" were used by Mr. Rands. His supervisor further instructed Mr. Rands to permit plaintiff to continue to perform on the Detroit—Nashville route. Mr. Rands advised plaintiff that its Chicago—Omaha contract was "terminated" and that damages would be assessed for the

---

**10.** Specifically plaintiff had not separately stated the burn-off rate of its aircraft, the hours of flying time on each route, and the then prevailing price per gallon.

**11.** *See* note 8, *supra.*

**12.** Mrs. Hovis testified that:

"[E]verything we had depended on keeping that contract; that we had sold or mortgaged everything we had, including our own home to fulfill our obligations on these contracts. * * * If we could go to Chicago and save our contracts, we would have all the money we needed to go on with the contracts."

additional cost of the services which were to have been provided under the terminated contract.

Mr. Rands further advised plaintiff that compensation already earned on the Chicago—Omaha route would be withheld; that compensation already earned on the Detroit—Nashville route would be withheld; and that future earnings on the Detroit—Nashville route would also be withheld. Plaintiff replied that if that were done, it would only be a matter of time before plaintiff would be unable to purchase fuel for the Detroit—Nashville route, resulting in termination of that contract as well.

The last payment received by plaintiff on either contract was August 15, 1975. Payments were ordinarily made at 2-week intervals. The Chicago—Omaha contract was formally terminated by letter of August 28, 1975 "for Contractor's failure to perform service according to the terms of the contract." The effective date of termination was said to have been August 25, 1975 (the day of the above-described meeting with Mr. Rands in Chicago). Plaintiff was advised therein that it was "responsible for damages due to the procurement of replacement service. You will be advised when the amount of damages is determined."

Mr. and Mrs. Hovis mortgaged or sold everything they owned and continued to buy fuel for and to operate the Detroit—Nashville route until their resources were exhausted. They discontinued service on September 9, 1975. That contract was formally terminated by letter of September 11, 1975, which contained an admonition with respect to assessment of damages identical to that above quoted for the Chicago—Omaha termination. The first termination and the withholding of accrued and future earnings on both contracts resulted in loss of financing for operational expenses and in bank foreclosure on all aircraft.

As stated in the board opinion:

The Postal Service terminated the Chicago—Omaha route despite the fact that [plaintiff] had an irrevocable commitment for continued and additional financing if the contract remained in effect and de-

spite the fact that for the accounting period immediately prior to its Omaha-Des Moines calamities, it had performed that contract at a 97% level of efficiency and the Detroit—Nashville contract at a 99.1% level of efficiency.

Plaintiff also alludes to the fact that Federal Express, another contractor operating within the Central Region at the same time, had a performance record below the required 96 percent during four consecutive accounting periods, but its contracts were not terminated for default nor were damages assessed against it. Instead the Federal Express contracts were terminated for the convenience of the Government and damages were paid to Federal Express. As to this, the board opinion states:

Apparently, [plaintiff] seeks to suggest some sort of discrimination in the treatment accorded to it as compared with the treatment accorded the other contract. That is not the purpose of this proceeding and, even if it were, there has been no sufficient exposition of the facts to provide a basis for a conclusion on such a question.

Shortly after terminating plaintiff's contracts, the Postal Service changed the routing on both the Chicago—Omaha and Detroit—Nashville contracts. Service was expedited with the new routing and as a consequence newer and faster aircraft were required. In the interim, an "emergency" contractor took over the two contracts which had been terminated, at a rate averaging 85 cents per great circle mile. This is over 20 cents more than plaintiff had been seeking in its request for adjustment, which had been lost and therefore not considered. The permanent contractor is apparently receiving still more than the "emergency" contractor, over different routing and with the requirement for faster aircraft.

By letter of March 16, 1976, the Postal Service advised plaintiff that the total cost of procuring "emergency" replacement service under both contracts was $32,988.60.

Contract provisions not previously set forth which have a bearing on this case are as follows:

*General Provisions*

5. Accountability of the Contractor.

\* \* \* \* \* \*

b. The Contractor shall remain accountable and answerable in damages (including damages pursuant to Clause 9, General Provisions of this contract), for the faithful performance of the obligations assumed by him under this contract * * *.

\* \* \* \* \* \*

e. The Contracting Officer may deduct from the compensation otherwise due the contractor under this contract, *and under any or all other contracts held by the Contractor for the transportation of mail,* for failure to perform according to this contract, those amounts of which the Contractor is accountable under this Clause 9 of the General Provisions of this contract. [Emphasis supplied].

\* \* \* \* \* \*

7. Adjustment for Compensation.

\* \* \* \* \* \*

(4) Examples:

(a) Adjustment in the rate will be considered for costs which could not have been reasonably anticipated, such as the following:

(i) Increase in aircraft requirements to comply with new safety regulations of Postal Service or the FAA.

\* \* \* \* \* \*

(iii) General increase within a State or regional area involving fuel costs * * *.

(iv) Landing or ramp fees resulting from new policies or rate changes at airports served.

\* \* \* \* \* \*

(5) Request for adjustment.

Any Contractor may * * * request an adjustment in compensation due to changed operating costs. The Contractor must demonstrate that the changed operating costs claimed have been properly allocated to service performed under the contract and shall submit, on PS Form 7457, an itemization of such changed costs, and such other supporting data as the Contracting Officer may require.

\* \* \* \* \* \*

(7) Prompt action on request.

The Contracting Officer and the Contractor shall negotiate promptly as to the requested adjustment and the Contracting Officer shall render his final decision not later than 90 days after receipt of a fully-documented request.

9. Damages.

a. The Contractor is accountable and answerable in damages for the faithful performance of the obligations he has assumed under the contract * * *.

\* \* \* \* \* \*

11. Release of the Contractor. The Contracting Officer is authorized in his discretion to release the Contractor for this contract, in the event of undue hardship to the Contractor arising from material changes in the service required of the Contractor, subject to the following conditions:

a. the Contractor has applied to the Contracting Officer for a release;

b. the Contracting Officer has determined that a release will be in the interests of the Postal Service; and,

c. The Postal Service has secured a new contract.

\* \* \* \* \* \*

12. Termination of the Postal Service for Default.

a. Upon the determination of the Contracting Officer that the public interest requires such action as a result of any of the following, the Contracting Officer may terminate the contract and assess and collect damages from the Contractor for the reprocurement of the service:

(1) for Contractor's failure to perform service according to the terms of the contract;

\* \* \* \* \* \*

(9) if the Contractor's equipment is insufficient, inadequate or otherwise inappropriate for the service;

\* \* \* \* \* \*

b. Termination of the contract under this Clause 12, shall not impair the right of the Postal Service to damages from the Contractor, and such damages may be assessed and liquidated for the purpose of set-off or counter-claim in the settlement of any claim of the contractor against the Postal Service arising under *this* contract. [Emphasis supplied].

c. If, after notice of termination of this contract under the provisions of this Clause, it is determined for any reason that the Contractor was not in default under the provisions of this Clause, or that the default was excusable, the rights and obligations of the parties shall be the same as if the notice of termination had been issued pursuant to Clause 13.

13. Termination for Convenience.

a. The Contracting Officer, \* \* \* may terminate this contract in whole or in part when it is in the best interest of the Postal Service. When termination is effected under this Clause, the Contractor shall be allowed as indemnity one twelfth of the annual compensation due under the contract \* \* \*. The Contractor agrees that this allowance shall constitute his full remedy for \* \* termination of this contract.

On the foregoing facts and contract provisions, the board (as duly authorized representative of the Postmaster General) denied plaintiff's appeal. In the course of its opinion, the board considered five "separate" issues, as follows:

### Issue No. 1

A. Whether or not a contractor's partial failure to provide mail service for seven days under a contract to provide mail service for four years constitutes a material breach of the contract as a whole thereby giving the Postal Service the right to terminate the contract and assess damages against the contractor for the cost of reprocurement.

On this issue, the board quotes from "[s]pecifications attached to Solicitation" to the effect that "[e]xcept for weather or other causes beyond the control of the contractor, the minimum level of acceptable performance is 96%." Since "for the period from July 19—August 15, 1975, Appellant's performance between Chicago and Omaha was only 90%" it is concluded that plaintiff's contract on that route was properly terminated.

In response to plaintiff's reliance on "Part 292 of Publication 171, Transportation of Mail by Air Taxi Operators," [13] the board observes that:

[T]he publication from which this excerpt is taken is nowhere formally made a part of the contract. On its face this provision is designated a recommendation and not a requirement. Thus, the Contracting Officer need not in every case wait until the conditions there specified have been fulfilled before taking the action on terminating a contract.

It substantiates this interpretation of the publication by quoting subpart 1 of Part 292, as follows:

1. When possible, contracting officers should follow the recommended *damage* schedules. They may deviate, however,

---

**13.** "292 Special Irregularities Subject to Damage Assessments

"These are irregularities that are most important to prevent and within reasonable control of the operator to do so. The following is a list of irregularities and a recommended schedule of *damages:*

\* \* \* \* \* \*
"h. Failure to meet minimum service reliability standard of 96% for:
\* \* \* \* \* \*
"(3) *Five consecutive accounting periods:* $1,000 or termination of contract." [Emphasis supplied].

to the extent deemed necessary when the situation warrants such action to achieve their purposes. [Emphasis supplied].

The board also alludes to General Provision No. 12, earlier set forth which specifically permits the Postal Service to terminate a contract for default "for Contractor's failure to perform service according to the terms of the contract." [14]

### Issue No. 2

B. Whether or not the theft of an airplane required to perform service under an airmail taxi contract creates a legal impossibility of performance which discharges the obligation of the operator to perform the service required by the contract.

After an exhaustive analysis of the authorities on "impossibility of performance," the board concludes that plaintiff's problem was "financial difficulty, which, in turn, was caused by conditions prevalent at the time of its acquisition of aircraft and that this difficulty was aggravated by a series of untoward events, none of which was attributable to Respondent." This issue is also resolved adversely to plaintiff.

### Issue No. 3

C. Whether or not the theft of an airplane required to perform service under an airmail taxi contract constitutes a "cause beyond the operator's control" and thereby excuses the operator's default.

The board finds this issue to be similar to No. 2 above, and reaches a similar conclusion, namely, that the root cause of plaintiff's failure was financial inability to rent a replacement aircraft.

14. The board's preoccupation with the minimum percentage level of performance, and with consecutive accounting periods, appears to be off the mark. These provisions appear to deal principally with a schedule of damages to be assessed for failure to maintain a minimum level of performance on an ongoing contract, not as a termination test. These contracts

### Issue No. 4

D. Whether or not a contractor's inability to perform is excused when the Postal Service's refusal to grant legitimate rate increases proximately contributes to the contractor's inability to perform.

As to this, the board finds that the receipt of a rate increase "was crucial to the continued operation" of plaintiff; that despite "this desperate need" and despite clear indications that the requisite papers had not been received, plaintiff "possibly because of preoccupation with other matters, inadvertence or oversight, never resubmitted the required forms or copies of the originals." Therefore, it concludes that failure to grant the increase did not excuse plaintiff's default.

### Issue No. 5

E. Whether or not the Postal Service may withhold money due to the contractor on a contract that is not in default for the purpose of satisfying damages to be assessed against the contractor at an indefinite time in the future on account of the contractor's default on another contract.

The board finds ample justification for this in the above-quoted General Provision 5(e) permitting withholding under "this contract and under any or all other contracts held by the Contractor for the transportation of mail." The contract provision is buttressed by long established, common law principles relating to setoff.

### OPINION

We reach the same conclusion as the board with regard to the propriety of the termination for default of these two contracts, but by a less circuitous route. The litmus test in these default termination

could be terminated simply for the contractor's failure to perform service according to the terms of the contract, and that is the basis in fact for the terminations in this case. It is therefore immaterial whether Part 292 of Publication 171 was or was not a part of the contract.

**378**

cases is to determine whether or not the causes which precipitated the default were "beyond the control of the contractor."[15] Financial incapacity to perform is not ordinarily regarded as "beyond the control of the contractor."[16] One who submits a bid for and accepts the award of a contract is deemed to have the financial capacity to perform it.[17]

■ An exception to this general rule is presented when the financial incapacity is itself precipitated by factors "beyond the control of the contractor."[18] From their inception, performance of these contracts was marked by crisis. The crisis above described could readily be regarded as having been "beyond the control of the contractor." But each individual crisis merely served to highlight plaintiff's financial incapacity. They did not cause that basic financial incapacity. Financial incapacity predated commencement of performance. Plaintiff's marginal financial health resulted in a dangerously late start, and did not afford the time necessary to purchase and properly inspect the aircraft it was to use in performing. Plaintiff's thin capitalization then made it impossible for it to absorb even routine and foreseeable problems, because there was no reserve for the temporary replacement of disabled aircraft with rental aircraft.

■ There is some treatment of the issue of whether the failure "to grant legitimate rate increases" contributed to plaintiff's inability to perform. As will be later demonstrated, the increases requested were not large and whether or not they would have tipped the scales against default is not clear from the record. Suffice it to say that plaintiff was aware that its original request had been lost and of the need to resubmit. It did not do so, and that is an omission which was not beyond its control.

■ Plaintiff also raises the issue that its contracts could have been "cancelled", that is, terminated for convenience, rather than terminated for default, and that whether or not they were so treated was within the discretion of a contracting officer who exercised that discretion favorably to another contractor, but not to plaintiff. As the board opinion observes, there has not been a sufficient exposition of the facts on this record to go into that issue. In any event, even if the record clearly demonstrated discrimination by the contracting officer, the terms of these contracts do not permit us to substitute our discretion for that exercised by the contracting officer.

■ Termination of the Detroit—Nashville contract under the circumstances earlier described presents tougher issues than were presented by the earlier Chicago—Omaha termination. This is because there is no evidence in the record that plaintiff could not have continued to perform satisfactorily on the Detroit—Nashville route

15. *National Eastern Corp. v. United States*, 201 Ct.Cl. 776, 477 F.2d 1347 (1973); *Appeal of Thermodyne International, Ltd.*, ASBCA Nos. 21997, 22096, 80–1 BCA ¶ 14,333.

16. *Consolidated Airborne Systems, Inc. v. United States*, 172 Ct.Cl. 588, 348 F.2d 941 (1965); *Kennedy, Trustee in Bankruptcy of Greenstreet, Inc., Bankrupt v. United States*, 164 Ct.Cl. 507 (1964); *Appeal of Office Equipment Co.*, ASBCA No. 4648, 58–1 BCA ¶ 1717.

17. See notes 15 and 16, *supra*. See also, *Appeal of H & H Mfg. Co., Inc.*, ASBCA No. 4353, 59–2 BCA ¶ 2425; *aff'd on review*, 168 Ct.Cl. 873 (1964).

18. See *Pilcher, Livingston & Wallace, Inc.*, ASBCA No. 13391, 70–1 BCA ¶ 8331; *Coastal Mfg. Co.*, ASBCA No. 11516, 67–1 BCA ¶ 6378; *Douglas Corp.*, ASBCA Nos. 3349, 3741, 58–1 BCA ¶ 1727; and *Paromel Electronics Corp.*, ASBCA Nos. 4025, 4123, 57–2 BCA ¶ 1503. See also, *Davis v. United States*, 180 Ct.Cl. 20 (1967); *Litchfield Mfg. Corp. v. United States*, 167 Ct.Cl. 604, 338 F.2d 94 (1964); *Lennox Metal Mfg. Co. v. United States*, 225 F.2d 302 (2d Cir. 1955); *Brooklyn & Queens Screen Mfg. Co. v. United States*, 97 Ct.Cl. 532 (1942); *Suburban Contracting Co. v. United States*, 76 Ct.Cl. 533 (1932); *Pigeon v. United States*, 27 Ct.Cl. 167 (1892); *National Radio Co.*, ASBCA No. 14707, 72–2 BCA ¶ 9486; *Emsco Screen Pipe Co.*, ASBCA Nos. 11917, 12184, 69–1 BCA ¶ 7710; *R.H.J. Corp.*, ASBCA No. 9922, 66–1 BCA ¶ 5361; *U. S. Services Corp.*, ASBCA Nos. 8291, 8433, 63 BCA ¶ 3703; *Q.V.S. Inc.*, ASBCA No. 3722, 58–2 BCA ¶ 2007; *George E. Martin & Co.*, ASBCA No. 3117, 56–2 BCA ¶ 1150. Cf. *Preuss v. United States*, 188 Ct.Cl. 469, 412 F.2d 1293 (1969).

had the Postal Service not discontinued accrued and future payments on the latter route as an offset against damages it anticipated collecting as a result of the Chicago—Omaha default.

Plaintiff's strongest argument on this point is that damages incurred as a result of the Chicago—Omaha termination had yet not been determined, liquidated, or assessed when the Postal Service began withholding monies otherwise due on the Detroit—Nashville contract, and those arbitrary withholdings directly resulted in plaintiff's financial incapacity to perform the Detroit—Nashville contract. In that connection, however, the record strongly suggests that an "emergency" contractor took over these routes as soon as plaintiff's contracts were terminated. The price charged by the "emergency" contractor immediately indicated that the Postal Service would incur damages in excess of $30,000. There were insufficient withheld payments on the Chicago—Omaha route to pay the damages incurred by plaintiff's default, and the contract permitted deductions from compensation otherwise due "under any or all other contracts held" by plaintiff. Moreover, this is a common law right available to any creditor.[19]

In summary, the circumstances under which these contracts were awarded to plaintiff in the first instance, and under which they were thereafter administered by the Postal Service are not exemplary. But the acts and omissions of the Postal Service are matched by plaintiff's naivete in seeking and accepting contracts phrased in these terms, while possessed of such limited resources to perform them. There was little or no margin for error, problems inevitably occurred, and that margin for error evaporated.

To the extent that the board's decision holding that these contracts were properly terminated for default is predicated on issues of fact, that decision is supported by substantial evidence. To the extent that it

represents a conclusion of law, it is deemed to be a correct conclusion of law.

There remains the matter of the defendant's claim for damages. As previously outlined, the Postal Service immediately let "emergency" contracts at a substantially increased rate following termination of each of plaintiff's contracts. This "emergency" service continued for 91 days on the Chicago—Omaha route and for 75 days on the Detroit—Nashville route at a cost of $122,449.95 plus $480 in "administrative" costs for a total of $122,929.95. Thereafter new routes were developed and new contracts were let which have no bearing on this dispute. During the periods covered by the "emergency" contracts, defendant would have paid $89,931.35 on plaintiff's contracts, so that defendant's excess costs are $32,998.60.

The board's decision properly observes, however, that defendant would have owed plaintiff more than $89,931.35 had the rates been properly adjusted upward on the basis of the lost request for adjustment, earlier described. The board concluded that an adjustment should properly be made at this time if defendant's damages are to be accurately computed. It therefore remanded with instructions to compute that adjustment in accordance with the contract terms.

In a second comprehensive decision on plaintiff's motion for reconsideration, the board reiterated its prior findings on the propriety of the default terminations, and it again urged the contracting officer to cooperate in determining the upward adjustments in contract price to which plaintiff would have been entitled had its contracts not been terminated. Thereafter, in a third decision, the board reviewed the rate adjustment provisions of the contract and examined rate adjustments constructed after the fact by the contracting officer. It concluded that the two contracts would have been entitled to upward adjustments in the total amount of $679.13. Its findings are supported by substantial evidence and are

19. *United States v. Munsey Trust Co.,* 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947); *Burlington Northern Inc. v. United States,* 199 Ct.Cl. 143, 462 F.2d 526 (1972); *Keith v. United States,* 72 Ct.Cl. 236 (1931).

entitled to finality under the standards of review set forth at the outset of this opinion.

Recapitulating, the gross damages resulting from the excess of the "emergency" contracts over plaintiff's contract rates for the corresponding periods, is $32,998.60. From this is subtracted $6,456.49, withheld as offsets on both contracts when they were terminated as earlier described, leaving a balance of $26,542.11. From this figure is further subtracted the sum of $679.13, the amount of adjustment in contract prices which the board found would have been made had the contracts not been terminated. Accordingly, defendant is entitled to damages by reason of the default terminations in the net amount of $25,862.98.