### In re BOSTON SHIPYARD CORP., Debtor.

### Appeal of BOSTON SHIPYARD CORP.

#### No. 89–1144.

United States Court of Appeals, First Circuit.

Heard June 7, 1989.
Decided Sept. 27, 1989.

Kevin F. Moloney with whom Barron & Stadfeld, P.C., Boston, Mass., was on brief, for appellant.

Andrea J. Larry, Civ. Div., Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., Washington, D.C., Wayne Budd, U.S. Atty., Boston, Mass., John P. McCambridge, Military Sealift Command, Atlantic, Dept. of Navy, J. Christopher Kohn and Robert M. Hollis, Civ. Div., Dept. of Justice, Washington, D.C., were on brief, for appellee U.S.

Before CAMPBELL, Chief Judge, REINHARDT* and TORRUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

Boston Shipyard Corporation ("BSC") appeals from the decision of the district court, which affirmed the bankruptcy court's grant of summary judgment in favor of appellee, the United States Military Sealift Command ("MSC").

## I. *Background*

BSC entered into a contract with MSC to overhaul the USNS Mississinewa. This contract was awarded even though BSC was in the midst of a Chapter 11 reorganization in the bankruptcy court. The original contract called for a 100 day performance period and for BSC to be paid $4,997,925.

As often happens, the contract proved to require much more time and expense than was originally anticipated. Each point that BSC realized a change in the contract specifications would be required, it filed a condition report or change order requesting authorization for the necessary changes so that the work could be done. Hundreds of these change orders were submitted and BSC claims that the delay in their resolution led to increased financial burdens on BSC, as well as to greatly hindered progress, causing the work to fall far behind schedule.

By the end of August 1985, BSC's financial condition had worsened and MSC payments were necessary for the company's continued ability to perform on the contract. BSC filed a claim seeking $536,132.31 in costs caused by alleged delays and disruption by MSC. Work had significantly slowed down due to a work stoppage by BSC's sub-contractors after payments to them were not made. MSC issued a cure notice to BSC advising it that the contract would be terminated within ten days unless BSC's subcontractors resumed work.

On Friday, August 30, BSC's president, Kenney, met to negotiate this dispute with MSC's deputy contracting officer, Rapka. Kenney hoped to receive progress payments for that week, negotiate a settlement of claimed costs due to delay and disruption, and to obtain a final determination of BSC's request for "advance payments." At this meeting, Rapka offered Kenney approximately $500,000 for monies owed up to that date and as settlement for all claimed delay and disruption costs

* Of the Ninth Circuit, sitting by designation.

through August 30. Also, MSC asked Kenney to withdraw his request for advance payments. This settlement was written up as Modification 14 to the contract.

Although Kenney did not want to sign the modification, and stated that he thought it was "ambiguous" and "inconsistent with the oral agreement," he did sign after being told that he would then immediately be given a check for the $500,-000. Two hundred payroll checks had to be distributed that day to BSC employees. Kenney, in an affidavit, stated that they could not have been paid unless he had received the money from MSC and, therefore, he concluded that he had no choice but to agree to the modification. He signed the modification and MSC then paid the full amount agreed upon.

On September 6, Kenney and Rapka met again. Rapka asked Kenney to sign a "receipt" stating that the money received on August 30 had been primarily for certain progress payments.[1] Although Kenney disagreed with the wording of the receipt, he signed the document after being told that he would receive no progress payment that day unless he did.

BSC curtailed its operations on the contract effective October 17, due, it claims, to the "effect of MSC's delays, disruption and failure to compensate BSC." Brief of Appellant at 24. A press release issued on that day stated that "[t]oday Boston Shipyard Corp. is forced to cease operations." On November 15, MSC terminated the contract because of this default by BSC.

The government filed a Proof of Claim in the United States Bankruptcy Court on February 25, 1986 seeking $9.2 million in reprocurement costs. BSC objected to the Proof of Claim and filed a counterclaim seeking to convert the default termination into a termination for the convenience of the government.

The government filed a motion for partial summary judgment, arguing that Modification 14 settled and released all claims against MSC up to and including August 30. The bankruptcy court granted this motion. Six months later, after full briefing and a hearing on the issues, the bankruptcy court entered summary judgment in favor of the government on the remainder of the case, based on its conclusion that BSC had inexcusably abandoned the contract. Upon appeal, the district court affirmed both summary judgment orders and BSC now appeals this decision.

## II. *Standards for Review of Summary Judgments*

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there exists no genuine issue of material fact and, as a matter of law, the movant is entitled to a judgment. *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988). Although "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis in original), we will review the record in the light most favorable to the non-movant and will, of course, indulge all inferences favorable to that party. *Oliver*, 846 F.2d at 105.

## III. *The Partial Summary Judgment*

BSC asserts that Modification 14 is void and therefore should not have controlled the bankruptcy court's partial summary judgment decision. It bases this argument on two grounds.

### A. Lack of Consideration

██ First, BSC argues that Modification 14 was not supported by proper considera-

---

1. Specifically, the document stated that the money was distributed to cover the following expenses:

| | | |
|---|---|---|
| a. | Base Contract (2.39% Increase) | $113,478 |
| b. | Changes (7% Increase) | 70,223 |
| c. | "B" Items Progress | 18,166 |
| d. | Rivet Extra (65% Complete) | 130,000 |
| e. | Lay Days (20 Days @ 8.5K/day) | 170,000 |
| | | $501,867 |

All of these expenses appear to be progress payments, except that the parties disagree as to whether lay day costs, the costs of maintaining the ship in dry dock, should be considered progress payments or delay and disruption costs.

tion. It claims that the $500,000 payment was a progress payment, already due to it, and was not a settlement of the costs for delay and disruption. It relies on an internal memorandum of MSC which stated, in regard to the August 30 payment, that "this payment is being made as progress for the following...." The memo then broke down the figure into the same components as were later inscribed on the receipt of September 6. *See* footnote 1, *supra.* Also, another MSC memo stated "I asked [Kenney] to sign a breakdown of the progress payments for 30 Aug 85.... This breakdown specifically states the payments are progress payments and not delayed (sic) or disruption."

The district court and the bankruptcy court both agreed with the government that, as a matter of law, there was ample consideration to support this modification. The district court found that, accepting all of BSC's allegations as true, the amount paid on that day was at least in part to settle BSC's disputed claim to delay and disruption costs and to release MSC from these claims. Therefore, because the money was not given solely to satisfy an acknowledged debt, there was good consideration. After a thorough review of the record in this case, we agree with the district court that, accepting all facts as alleged by BSC as true, there existed adequate consideration to support the modification.

Modification 14 states clearly

b. THIS MODIFICATION DEFINITIZES A SETTLEMENT OF ALL CONTRACTOR'S CLAIMS ON THE ABOVE JOB ORDER AS OF 30 AUGUST 1985. THESE INCLUDE THE CONTRACTOR'S CLAIM FOR DELAY AND DISRUPTION DATED 20 AUGUST 1985 FOR *$536,132.31* AND ANY AND ALL POTENTIAL CLAIMS THAT CONTRACTOR COULD BRING FOR ANY ACTION OR OMISSION OF WHATEVER TYPE OCCURRING IN THIS PERIOD FROM MAY 1985 THROUGH 30 AUGUST 1985.

UNDER THIS AGREEMENT, THE CONTRACTOR AGREES TO RELEASE AND DISCHARGE THE UNITED STATES, ITS OFFICERS, AGENTS, EMPLOYEES OF ALL POTENTIAL OR ACTUAL CLAIMS FOR DELAY AND DISRUPTION, ADDITIONAL WORK, AND ALL OTHER LIABILITIES, OBLIGATIONS, AND DEMANDS WHATSOEVER RELATED TO OR ARISING FROM THIS JOB ORDER PRIOR TO 31 AUGUST 1985.... IN EXCHANGE FOR THIS AND OTHER CONSIDERATIONS, THE GOVERNMENT AGREES TO PAY THE CONTRACTOR *$501,-867.00.*

c. THE CONTRACTOR FURTHER AGREES TO WORK WITH AND FULLY COOPERATE WITH A [MSC] MANAGEMENT TEAM, WHICH WILL BE PRESENT AT THE SHIPYARD FOR THE PURPOSE OF ENSURING PROGRESS AND A TIMELY COMPLETION OF THE REPAIR WORK ON THE VESSEL.

d. BOSTON SHIPYARD CORPORATION AGREES TO WITHDRAW ITS REQUEST FOR ADVANCED PAYMENTS SUBMITTED ON 28 AUGUST 1985.

Defendant's Exhibit 1.

Regardless of labels attached to this agreement in later documents, the modification itself makes clear that it is to serve as a release of all claims against MSC and that, once BSC had accepted on that date the check for the amount offered, the parties had reached an accord and satisfaction on all possible claims, including those for delay and disruption costs. The wording is plain that this payment was not being offered solely as a progress payment due under a previous bargain. Rather, these claims were in dispute and the parties executed this agreement in order to settle the dispute and release MSC from these claims.

BSC argues that even if MSC intended this agreement to act as a release, subsequent actions of MSC, inconsistent with the terms of the modification,[2] waive its effect.

---

**2.** BSC points to evidence in the record indicating that MSC made payments after Modification 14 was executed for delay and disruption costs incurred prior to August 31.

"The Court of Claims has held that the execution of a general release to the government will not bar the contractor from bringing claims inconsistent with the release, where the parties' actions subsequent to the release evidence ... the government's waiver of the release." *Robert E. McKee, Inc. v. Atlanta*, 431 F.Supp. 1198, 1200 (N.D.Ga.1977) (citations omitted); *see, e.g., Adler Construction Co. v. United States*, 191 Ct.Cl. 607, 423 F.2d 1362, 1365–66 (1970) (finding no waiver of release after examination of government's actions), *cert. denied*, 400 U.S. 993, 91 S.Ct. 461, 27 L.Ed.2d 441 (1971).

BSC does not, however, put forth *any* evidence to support its contention that the four payments made by MSC indicate a waiver of the release. It may be that some of this money was for debts acquired prior to August 31. Nevertheless, it is permissible for the MSC to make some of the payments and still retain the integrity of the release. Most importantly, however, it appears that BSC did not raise this issue before the bankruptcy court or even at the district court level. As arguments not raised at the trial level will not be entertained upon appeal, *United States v. Kobrosky*, 711 F.2d 449, 457 (1st Cir.1983); *Johnston v. Holiday Inns, Inc.*, 595 F.2d 890, 894 (1st Cir.1979), we dismiss BSC's argument that the government has waived the release.

### B. Duress Argument

■ BSC also argues that Modification 14 is *void because it was signed under* conditions of economic duress. It is well-settled, however, that "[a] contract or release, the execution of which is induced by duress, is voidable, not void, and the person claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so." *Di Rose v. PK Management Corp.*, 691 F.2d 628, 633–34 (2d Cir.1982), *cert. denied*, 461 U.S. 915, 103 S.Ct. 1896, 77 L.Ed.2d 285 (1983). Thus, before examining BSC's duress argument on the merits, we must first examine whether it has preserved its right to make this claim.

If the coerced party does not contest within a reasonable time the document allegedly executed under duress, the contract or release may be ratified and affirmed. *See Teamsters Local No. 25 v. Penn Transportation Corp.*, 359 F.Supp. 344, 349 (D.Mass.1973). A party may ratify an agreement entered into under duress in a number of different ways: "first, by intentionally accepting benefits under the contract; second, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it; and third, by recognizing its validity ... by acting upon it, performing under it, or affirmatively acknowledging it." *United States v. McBride*, 571 F.Supp. 596, 613 (S.D.Tex.1983). Thus, like in cases of fraud, one seeking to repudiate an agreement allegedly entered into under duress must promptly complain of the circumstances under which the document was signed. *See* Annotation, *Ratification of Contract Voidable for Duress*, 77 A.L. R.2d 426 (1988).

In this case, BSC waited for over a year and a half before claiming that the modification had been signed under duress. It accepted the $500,000 payment in return for the modification, accepted other payments made by MSC, and continued to willingly work with MSC for almost three months until *MSC* terminated the contract. Although BSC argued that the September 6 receipt had been signed under duress almost a year earlier, it did not make the same argument with respect to the modification until March 1987, and then only in response to the government's motion for partial summary judgment in which the validity of the modification was clearly determinative. In fact, BSC did not even allege duress in response to the government's proof of claim.

These undisputed facts indicate that BSC ratified the modification and thereby waived any claim of duress. Although BSC argues that it disagreed with the modification (stating that the modification was "ambiguous" and "inconsistent") and asked if it could be cancelled, this alone, with no allegation of duress, is insufficient.

Therefore, because there was consideration to support Modification 14 and BSC waived any claims of duress, we affirm the decision of the district court, affirming the bankruptcy court's grant of partial summary judgment in favor of MSC.

## IV. *The Summary Judgment*

BSC also challenges the district court's decision affirming the grant of summary judgment to MSC on the remainder of the claims. This decision is dependent upon whether BSC's termination of services constituted abandonment and breach of contract, thereby warranting the government's termination of the contract, or whether BSC's cessation of work could be justified by MSC's actions.

In granting MSC's motion, the bankruptcy court relied upon the Master Agreement for Repair and Alteration of Vessels (the "Master Agreement") as the controlling contract between the parties. Clause 13 of the Master Agreement consists of Federal Acquisition Regulation ("FAR") § 52.233–1, which states

> (h) The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer.

The bankruptcy court held that under this provision BSC was obligated to continue work until its dispute with MSC was resolved and that therefore its cessation constituted wrongful abandonment of the contract. The court carefully examined the actions of MSC and concluded that BSC's breach was not justified by these actions. This decision was affirmed without significant discussion by the district court.

On appeal, BSC argues that the decisions of the two lower courts should be reversed because the bankruptcy court made a number of factual errors and because there still exists genuine issues of material fact on the question of whether BSC's failure to

continue its performance on the contract was excusable due to MSC's actions. Although BSC claims that the bankruptcy court's factual findings were substantially inaccurate, there is no evidence or even allegation supporting these claims, and, in fact, BSC's own affidavits support the conclusions of the bankruptcy court.[3]

BSC bases the second part of this argument on MSC's alleged failure to make progress payments and other acts which led to BSC's weakened financial condition, which, it argues, justified abandonment of the contract. We agree with the decisions of the courts below.

Although Clause 13 is admittedly controlling, BSC argues that its work cessation was justified because MSC's actions had caused a cardinal change to the agreed-upon contract. *See Air–A–Plane Corp. v. United States*, 187 Ct.Cl. 269, 408 F.2d 1030 (1969). A cardinal change is considered a breach of the contract and therefore further work, even when a disputes clause exists, is not required. *General Dynamics Corp. v. United States*, 218 Ct.Cl. 40, 585 F.2d 457, 462 (1978); *Allied Materials & Equipment Co. v. United States*, 215 Ct.Cl. 406, 569 F.2d 562, 563 (1978). Change orders or other changes are considered to be cardinal changes if they greatly increase the burden of the contract, in effect changes that are outside the scope of the contract itself. *General Dynamics*, 585 F.2d at 462. A cardinal change is said to occur

> when the government effects an alteration in the work *so drastic* that it effectively requires the contractor to perform duties materially different from those originally bargained for. By definition, then, a cardinal change is so profound that it is not redressable under the contract, and thus renders the government in breach.

*Allied Materials*, 569 F.2d at 563–64 (emphasis added). In making this determination, the court is to look at all relevant

---

**3.** This argument also was not made to the district court below. As we have repeatedly instructed, this court will not, except under the most compelling circumstances, entertain arguments for the first time upon appeal. *United States v. Kobrosky*, 711 F.2d 449, 457 (1st Cir. 1983); *Johnston v. Holiday Inns, Inc.*, 595 F.2d 890, 894 (1st Cir.1979).

circumstances, including, but certainly not limited to, the increase in cost of completing the contract and the number of changes made. *See Air–A–Plane*, 408 F.2d at 1033.

There were 86 post-August change orders, most of which were initiated by BSC through condition reports. The contract between the parties contained a change clause, providing for an effective and efficient procedure for dealing with changes that would arise in the course of the contract's performance. Thus, the parties clearly anticipated that changes would need to be made.

Moreover, the contract was an "open and inspect" contract calling for reconditioning work throughout the ship. In this type of contract the full amount of the work that will be necessary can not be known until the ship is opened up in dry dock and only then can the full extent of the contract be established. Moreover, the contract provided for a large number of so-called "B" items, which were not required by the contract, but which the government could, at its discretion, require BSC to perform. These factors also indicate that the need for change orders must have been anticipated by the parties from the contract's inception.

■ We cannot conclude that these change orders amounted to a cardinal change, putting the government in breach and justifying BSC's abandonment of the contract. Some delay and disruption must be expected in the performance of any contract. *See Magoba Construction Co. v. United States*, 99 Ct.Cl. 662, 690 (1943). Accepting all of BSC's allegations as true, the change orders that arose were predictable, due to the type of contract at issue in this case. Moreover, they were not of the magnitude or extent that would signify a cardinal change.

BSC also argues that its failure to perform due to its financial incapacity must be excused because its money problems had been caused by MSC's actions. Unfortunately, it concentrates this part of its argument on cases which hold that the government must make financial remuneration for change orders issued, a premise not disputed, it seems, by either party. Nevertheless, we will use what guidance the cases do give to properly focus this inquiry.

We start with the general premise that a contractor's default may be excused if the causes of the default were beyond the contractor's control. *Southeastern Airways Corp. v. United States*, 230 Ct.Cl. 47, 673 F.2d 368, 377–78 (1982). Financial incapacity, however, is generally not considered beyond the contractor's control. *Id.* 673 F.2d at 378. This rule is understandable, as a contractor who makes and then accepts a bid should have the financial ability to perform. But, as with most rules, there are always exceptions. Thus, if the financial problems are caused by factors beyond the contractor's control, or by the government's actions themselves, then the contractor's default may be justified. *Id.; see also National Eastern Corp. v. United States*, 201 Ct.Cl. 776, 477 F.2d 1347, 1356 (1973) (stating that a contractor's incapacity is *"a fortiori"* beyond the control of the contractor if caused by acts of the Government).

■ The period in question ranged from September 1 to October 15, when BSC stopped its operations. BSC argues that government delays resulted in non-payment of $218,907, plus $30,608 for contract modifications which went uncollected.[4] Thus, BSC argues that a total of $249,515, delayed in payment over short periods of time, prevented it from working on a contract worth, by the termination date, over $6.5 million.[5] We cannot agree. The evi-

---

**4.** BSC also argues that the government owed it $458,500 in lay day costs and general services payments accrued during this post-Modification 14 period. BSC's entitlement to these costs was disputed by the parties and therefore BSC was required to pursue the remedies available under the dispute resolution provision of the contract. A contractor may not abandon a contract solely because it *claims* there is money due. Never-

theless, this sum, even added to the other amounts claimed, would not be enough to indicate that the government caused BSC's financial problems or that a cardinal change in the contract occurred.

**5.** We note, as did the bankruptcy court in this case, that 33 of the 86 post-August 31 change

dence in the record indicates that BSC's "thin capitalization made it impossible for it to absorb even routine and foreseeable problems." *Southeastern Airways,* 673 F.2d at 378. It is clear that in this case BSC's financial problems were not caused by any delay or disruption by MSC. Rather, BSC's "[f]inancial incapacity predated commencement of performance." *Id.*

A different decision would make government contracts truly unworkable, allowing contractors to demand immediate reimbursement for cost overruns, even if the government disagrees with the claim. There would then be no meaning to default or dispute clauses that define procedures in case of disputes.

*Affirmed.*

---

orders were dated after October 1. Thus, they were *at most* two weeks old at the time that BSC stopped working. The reasonableness of this short delay, as well as the remoteness of the possibility that a two-week delay could create BSC's financial crisis, must also be considered.