**In re SANNER CONTRACTING CO., Debtor.**

**Bankruptcy No. 89–11744–PHX–SSC.**

United States Bankruptcy Court, D. Arizona.

May 4, 1995.

Sean P. O'Brien, Christopher M. McNichol, Gust Rosenfeld, Phoenix, AZ, for Bank of America, Ariz.

Charles W. Lowe, Davis & Lowe, P.C., Phoenix, AZ, for debtor.

Edwin P. Lee, Phoenix, AZ, for trustee, Robert J. Davis.

## OPINION

SARAH SHARER CURLEY, Bankruptcy Judge.

### PROCEDURAL BACKGROUND

This matter comes before this Court on a "Motion to Approve Compromise with Caliber Bank" filed on February 3, 1994 by Robert J. Davis, the Chapter 7 Trustee (hereinafter "the Trustee"). On March 17, 1994, Bank of America, formerly known as Caliber Bank (hereinafter "BA"), filed a "Notice of Supplementing Record" in which BA provided a fully executed copy of the settlement agreement.

On March 30, 1994, SANNER CONTRACTING CO. (hereinafter "Debtor") filed an "Objection to Trustee's Motion to Approve Compromise With Caliber Bank". The Debtor argued that BA did not have a perfected security interest in the settlement proceeds from the litigation on the contract between the Debtor and the Bureau of Indian Affairs; and that BA had only obtained a perfected security interest on certain "contract rights" and "accounts", which did not include the settlement proceeds. BA filed a response to the Debtor's objection on April 6.

On April 6, the Debtor filed a motion to continue the hearing and requested a further opportunity to respond to the issues raised by BA in its Response. This Court granted the Debtor's Motion to Continue the hearing

on the Trustee's Motion to Compromise, because of the unique issues involved and because an evidentiary hearing was required.[1]

The Court conducted the evidentiary hearing on June 7, 1994, July 29, 1994, and September 1, 1994. BA filed a hearing memorandum on June 6; the Trustee, on June 7; and the Debtor, on August 31, 1994.

At the conclusion of the hearing on September 1, 1994, this Court then deemed the matter under advisement.

This constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052, *Rules of Bankruptcy Procedure* (hereinafter "RBP"). This is a "core" proceeding and this Court has jurisdiction over this matter. 28 U.S.C. §§ 1334 and 157.

### FACTUAL BACKGROUND

**A. The Loan Agreement Between The Debtor And BA.**

BA loaned funds to the Debtor and took a security interest in certain personal property of the Debtor pursuant to the Accounts Financing Revolving Loan and Security Agreement dated July 23, 1985.[2] BA perfected its security interest in certain property on July 30, 1985 by the filing of the UCC–1 Financing Statement with the Arizona Secretary of State.[3] The UCC–1 expressly stated, in part, that the collateral for the loan included:

All accounts receivable, instruments, chattel paper and contract rights now in existence or that may hereafter be acquired and all proceeds thereof in any form.[4]

BA filed a continuation statement on July 15, 1991 with the Secretary of State to maintain its perfected security interest in the collater-

---

1. The Court ordered that the Debtor file and serve a reply by April 20, 1994. The Debtor filed its Reply on April 21. This Court set a discovery deadline of May 20, 1994, set May 27 as the date by which the parties should exchange their list of witnesses and exhibits, including impeachment evidence, and ordered that the parties file a proposed joint pretrial order by May 31, 1994. The proposed joint pretrial order was actually filed on June 7, 1994.

2. *See* Joint Pretrial Order (hereinafter "JPO") filed June 7, 1994, Docket No. 416, p. 3; Trustee's/Bank's Exhibit B and Debtor's Exhibit No. 5.

3. *See* Trustee's/Bank's Exhibit A and Debtor's Exhibit Nos. 2 and 4. Exhibit A contains the complete package on the Debtor's financing statements.

4. *See* Trustee's/Bank's Exhibit A and Debtor's Exhibit No. 2.

al.[5]

### B. The BIA Contract.

The Debtor subsequently bid on a contract with the Bureau of Indian Affairs (hereinafter "BIA").[6] Pursuant to the letter dated September 27, 1987, Debtor was awarded BIA Contract No. H50C14207326 (hereinafter "Contract").[7] This Contract contained provisions regarding the variation in estimated quantity of fill or rock to complete the job, suspension of work, disputes as to the performance of the contract, differing site conditions, site investigation, conditions affecting the work and changes.[8] The differing site conditions provision stated:

> If conditions do materially so differ and cause an increase or decrease in the Contractor's costs of, or the time required for, performing any part of the work under this contract whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.[9]

The Contract provided that the Debtor would perform grading, draining and placing aggregate sub-base on a 9.9039–mile stretch of the roadway to be constructed on Routes 70 and 71 of the Fort Apache Indian Reservation in Navajo and Apache Counties, Arizona.[10] The BIA initially agreed that the Debtor would be paid $1,312,474.40, pursuant to the Debtor's estimate.[11] The completion date was subsequently extended by the parties due to difficulties encountered by the Debtor. BIA personnel, primarily in the Phoenix office located away from the job site, had prepared the plans as to the construction project. The Contract was to balance the excavating cut and fill work so that no excess dirt or importation of dirt was contemplated.[12] The Contract also contemplated that there would be normal site conditions; that is, no huge boulders or rocks were to be encountered. Because of the construction problems encountered by the Debtor, the BIA and the Debtor modified the Contract on two separate occasions to extend the date of performance.[13] The parties modified the Contract to provide that the Debtor would be paid the sum of $1,414,322.50.[14] The Debtor ultimately completed the project eighty-nine days late.

### C. The BIA Litigation and Settlement.

Throughout construction, the Debtor had meetings with the BIA officials. The Debtor asserted that it was entitled to an additional sum of $970,950 in compensation to complete the Contract. At the Agency level and as part of the initial discussions between the Debtor and the BIA contracting officer, the BIA only conceded that the Debtor was entitled to reimbursement for increased costs of $52,966, which the Debtor rejected.[15] The Debtor filed a certified claim with the BIA for $941,500, but there was no decision from the BIA contracting officer.[16] The Debtor then filed a notice of appeal with the Interior Board of Contract Appeals (hereinafter "IBCA"), but the appeal was dismissed without prejudice, with the BIA contracting officer at the agency level to render a decision within sixty days.[17] No decision was rendered. The Debtor then filed a second notice of appeal and a complaint.[18] The Debtor

---

5. *See* Trustee's/Bank's Exhibit No. A; Debtor's Exhibit No. 4.

6. *See* JPO, p. 3.

7. *See* JPO, p. 3.

8. *See* JPO, p. 3 and Debtor's Exhibit No. 1, Contract Clauses, pp. 2–3, 18–20, 25, ¶¶ 7, 8, 26, 28, 29, and 44.

9. *See* Debtor's Exhibit No. 1, Contract Clauses, p. 19 therein, ¶ 28, subparagraph (b).

10. *See* JPO, p. 4.

11. *See* JPO, p. 4.

12. *See* JPO, p. 4.

13. *See* JPO, p. 5.

14. *See* Debtor's Exhibit No. 9.

15. *See* JPO, pp. 5–6.

16. *See* Debtor's Exhibit No. 13, letter to BIA dated August 1, 1989, which explains the claim of the $941,500.00.

17. *See* JPO, p. 6.

18. *See* JPO, p. 7.

filed the Complaint on February 23, 1990, with the IBCA.[19] On April 3, 1990, the BIA filed its answer.[20]

In its Complaint, the Debtor argued that equitable adjustments in the contract price must be made pursuant to provisions of the Contract to compensate the Debtor for the difficulties, delays, disruptions and increased costs, which were allegedly caused solely by the BIA's design errors, differing site conditions encountered by the Debtor from those represented by the BIA, and the plan specifications which had defects as prepared by the BIA.[21] The Complaint alleged four claims for relief: (1) equitable adjustments and other relief under the Disputes Clause; (2) breach of contract; (3) breach of implied warranty of specifications; and (4) relief for breach of implied fair dealing and good faith.[22]

Although the Complaint was initially filed by the Debtor, the Trustee was subsequently substituted as the real party in interest.[23]

On the eve of trial before the IBCA, the Trustee and the BIA entered into a settlement. On July 9, 1993, this Court authorized the Trustee to enter into the settlement with the BIA, with the bankruptcy estate to be paid the sum of $613,286.50.[24] To evidence the settlement, the Trustee and the BIA executed an Amendment of Solicitation/Modification of Contract (Modification No. 4).[25] The Modification states that it was issued pursuant to Clause No. 68 of the Contract and the description of the Modification states:

PROJECT FAIR 70(2)

1. This modification is issued to reflect the final settlement reached regarding IBCA Claim No. 2689 between Sanner Contracting Co. and Bureau of Indian Affairs. The settlement amount is $550,-000.00 inclusive of attorney fees, interest and liquidated damages.[26]

Modifications 5 and 6 were also executed to allow for an increase in the settlement amount to be paid to the bankruptcy estate to the amount of $613,286.50.[27]

### D. The Separate Settlement Agreement Between The Trustee And BA.

Of the $613,286.50 received in settlement proceeds with the BIA, this Court approved the sum of $183,533.08 to be applied toward the fees and costs of special counsel in prosecuting the appeal on behalf of first, the Debtor, and then, the Trustee; the sum of $30,-995.00 to be applied towards expert witness fees; the sum of $287 to be applied against administrative expenses; and the balance or the sum of $398,471.42, to be paid to the bankruptcy estate.[28]

Subsequently, the Trustee and BA entered into a separate settlement agreement. The sum of $125,000 would be retained by the Trustee for the bankruptcy estate, and the sum of $273,471.42 would be paid to BA.[29] The accrued interest on the funds was to be divided proportionately between the Trustee and BA.[30] BA agreed to release all of BA's secured and unsecured claims as to the assets of the bankruptcy estate and the Debtor, including certain accounts upon which BA

19. *See* JPO, p. 7. *See also* Debtor's Exhibit No. 6, which is signed and dated but does not reflect the date of filing.

20. *See* JPO, p. 7.

21. *See* JPO, pp. 7–8 and Debtor's Exhibit No. 6.

22. *See* Debtor's Exhibit No. 6.

23. Although the Debtor filed the complaint as a part of the appellate process with the IBCA, the Debtor's case was converted on October 31, 1992, from a Chapter 11 to a Chapter 7 proceeding. Hence, the Trustee became the real party in interest.

24. *See* JPO, p. 11.

25. *See* Debtor's Exhibit No. 10.

26. *See* Debtor's Exhibit No. 10. The Settlement Agreement between the Trustee and the BIA is Debtor's Exhibit No. 16 and reflects a settlement amount of $550,000. The settlement amount was subsequently increased to $613,286.50.

27. *See* Debtor's Exhibit Nos. 11 and 12.

28. *See* Debtor's Exhibit No. 15, I, ¶1.3, p. 2. *See also* generally JPO, p. 11.

29. *See* Debtor's Exhibit No. 15, II, ¶2.1, pp. 3–4.

30. *See supra,* note 29.

had a perfected security interest.[31] The Trustee and BA also released each other from any and all liability, claims, obligations, demands, actions, causes of actions and rights whatsoever which existed or might thereafter arise.[32]

## ISSUES

BA claims a perfected security interest in the settlement proceeds received from the settlement with the BIA. The Debtor states that the BIA settlement proceeds are not accounts or contract rights of the Debtor, but rather constitute a general intangible as to which BA never obtained a perfected security interest. Hence, the Debtor argues that any settlement between the Trustee and BA as to the BIA proceeds, which provides a substantial payment to BA is patently unreasonable and should not be approved. The issues before this Court are:

A. **Whether the settlement between the Trustee and BA is in the best interest of the bankruptcy estate.**

B. **Whether the BIA settlement proceeds constitute an account or contract right of the Debtor upon which BA obtained a perfected security interest.**

## ANALYSIS

A. **Whether the settlement between the Trustee and BA is in the best interest of the bankruptcy estate.**

■ This Court has wide discretion in granting approval of compromises between trustees and creditors. The standard of review is an abuse of discretion. *In re A & C Properties,* 784 F.2d 1377 (9th Cir.1986), *cert. denied sub nom., Martin v. Robinson,* 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986); *A & A Sign v. Maughan,* 419 F.2d 1152 (9th Cir.1969). However, this Court must determine whether the settlement or compromise is reasonable under the particular circumstances of the case. *In re The General Store of Beverly Hills,* 11 B.R. 539 (Bankr. 9th Cir.1981); *In re Equity Funding Corp. of America,* 519 F.2d 1274 (9th Cir.

1975). As part of this analysis, this Court must consider the following factors:

i. the probability of successful litigation;

ii. any impediments to collection;

iii. the complexity, expense, inconvenience and delay of litigation; and

iv. the interests of the creditors with deference to their reasonable opinions.

*In re Woodson,* 839 F.2d 610, 620–21 (9th Cir.1988); *A & C Properties,* 784 F.2d at 1381; *In re Blair,* 538 F.2d 849, 851 (9th Cir.1976). However, the Trustee or debtor in possession must do more than merely reference the aforesaid factors in seeking approval of the settlement. The trustee must provide support for each of the factors. *See In re MGS Marketing,* 111 B.R. 264 (9th Cir. BAP 1990).

i. *The Probability of Successful Litigation.*

■ This was the most highly contested issue at trial. This Court should note that no creditor questioned the Trustee's analysis of this issue, only the Debtor or (more correctly) the principal of the Debtor. In its Reply and at the time of trial, the Debtor relied on the Bankruptcy Appellate Panel (hereinafter "BAP") decision of *In re MGS Marketing,* 111 B.R. 264 (Bankr. 9th Cir.1990), in which the Court noted that a settlement agreement should not be approved, if the trustee could succeed easily at any trial on the issues.

It is the Debtor's belief that the Trustee in this case need only file a motion for summary judgment against BA, and the Trustee will succeed as a matter of law. The Debtor is convinced the BIA settlement proceeds are a general intangible upon which BA never obtained a perfected security interest. However, as will be detailed in Part B of this decision, this Court believes that BA may advance a strong argument that the BIA settlement proceeds are within the scope of its perfected security interest. Hence, the Trustee utilized appropriate business judgment in settling this matter.

**31.** *See supra,* note 29.

**32.** *See* Debtor's Exhibit No. 15, Article II, ¶ 2.3, p. 4.

*ii. Any Impediments to Collection.*

Since the Trustee is holding the BIA settlement proceeds, and the parties are in disagreement only as to how these proceeds should be allocated, this matter has not been considered by this Court at least as to this settlement.

*iii. The Complexity, Expense, Inconvenience and Delay of Litigation.*

■ The Trustee and BA called an expert witness to provide this Court with background information as to the appellate process in resolving a contract dispute with the federal government and, more specifically, with the Interior Board of Contract Appeals. The Court concludes that this witness was extremely knowledgeable in this area. The expert witness consistently testified that he had not pursued a breach of contract claim against the BIA, rather he had sought only a modification of the Contract to provide increased compensation to the Debtor/bankruptcy estate.

Based upon this expert's testimony, the Court concludes that the BIA settlement proceeds constitute an account or a contract right upon which BA has a perfected security interest. If the Trustee and BA had ever litigated this matter, this Court assumes that each side would have called their respective expert witnesses to opine at great length on his area of federal law. Certainly such litigation between the Trustee and BA would have been protracted and costly, as the experts for each side opined at length on the various cases discussing federal law as to contract disputes with the Interior Board of Contract Appeals or other federal agencies, how to settle such disputes, whether to classify the settlement as a breach of contract or a modification of the contract, and other issues. Given the complex nature, the expense, and the protracted trial between the Trustee and BA as to how to categorize the BIA settle-

ment proceeds, the Trustee's settlement with BA was reasonable and appropriate.

*iv. The Interests of the Creditors with Deference to Their Reasonable Opinions.*

As noted previously, no creditor objected to the settlement between the Trustee and BA, only the Debtor. Certainly the principal of the Debtor had her own independent concerns. Debtor's counsel stated that if the settlement with BA were approved by the Court, the Debtor's principal would be faced with a sizeable tax liability. Moreover, the Debtor retained the special counsel that testified as an expert witness at this trial concerning federal government contracts and the appellate process concerning contract disputes. *As an agent of the Debtor, special counsel agreed to litigate the matter as a modification to the Contract.* Although a breach of contract claim was initially alleged, special counsel repeatedly testified that this claim was not pursued. In essence, the Debtor must live with the decision of its own special counsel.

**B. Whether the BIA settlement proceeds constitute an account or contract right of the Debtor upon which BA obtained a perfected security interest.**

■ In determining whether BA arguably had a perfected security interest on the BIA settlement proceeds, the Court must review Arizona law. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

Article 9, of the *Uniform Commercial Code,* adopted by the State of Arizona, defines accounts and general intangibles. An account is defined as being the "right to payment for ... services rendered which is not evidenced by an instrument[33] or chattel

---

**33.** *Ariz.Rev.Stat.Ann.* § 47–9105(A)(11) (West 1990 & Supp.1994) defined an instrument as: a negotiable instrument (defined in § 47–3104), or a security (defined in § 47–8102), or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is

in ordinary course of business transferred by delivery with any necessary indorsement or assignment.

In 1994, this provision was amended by including the word "certificated" just before the word "security". *Ariz.Rev.Stat.Ann.* § 47–9105(A)(11) (West Supp.1994).

paper [34] whether or not it has been earned by performance." *Ariz.Rev.Stat.Ann.* § 47–9106 (West 1988). The definition of "general intangible" is "any personal property ... other than goods, accounts, chattel paper, documents, instruments and money." *Ariz. Rev.Stat.Ann.* § 47–9106 (West 1988).

BA also utilized the term "contract rights" in its Security Agreement and Financing Statement. "Contract Right" has been previously defined in *Ariz.Rev.Stat. Ann.* § 44–3106 (1967) as "a right to payment not evidenced by an instrument or paper." *In re Le Sueur's Fiesta Store, Inc.*, 40 B.R. 160, 162 (Bankr.D.Ariz.1984). However, the Arizona *Uniform Commercial Code* deleted this term in 1975.[35] Based upon recent case law, the statutory deletion is not dispositive. This Court may consider the term in determining the intent of the parties. *See Duke v. Arizona Bd. of Regents*, 150 Ariz. 32, 34, 721 P.2d 1159, 1161 (Ariz.App.1986). *See also, Southwest Sav. and Loan Ass'n v. Sun-Amp Sys. Inc.*, 172 Ariz. 553, 838 P.2d 1314 (Ariz.App.1992) (stating that "our Supreme Court has warned that in determining contract rights, courts are not constrained by textual omissions to abandon common sense and experience or to acquire the surrounding circumstances of an agreement." Citing *Burkons v. Ticor Title Ins. Co.*, 168 Ariz. 345, 350–51, 813 P.2d 710, 715–16 (1991)).

This Court could find no published Arizona cases which have analyzed the distinction between accounts and contract rights versus general intangibles. In the decision of *Everett Home Town Ltd. Partnership*, 146 B.R. 453 (Bankr.D.Ariz.1992), the court discussed only what constituted an account under *Ariz. Rev.Stat.Ann.* § 47–9106. *Id.* at 457. The *Everett Home* court stated that hotel revenues, whether in the form of cash, credit card receipts or (in a few instances) accounts receivable did not fall within the definition of

an account. *Id.* This conclusion was reached because irrespective of the method of payment, no goods were received and, thus, were not encompassed within the definition of accounts pursuant to *Ariz.Rev.Stat. Ann.* § 47–9106.[36] In addition, the *Everett Home* court determined that credit card receipts were instruments and, thus, were neither accounts nor goods.

This Court has some concerns about the *Everett Home* decision. First, the court only seemed to consider the definitions of an instrument, chattel paper and goods in its analysis of what constituted an account. The court then assumed that accounts must only pertain to the sale of goods. This seems to be an overly restrictive view of what constitutes an account.

A debtor may provide services to a third party and agree that the debtor will be paid in thirty days after all services are completed. The debtor may be engaged in road construction or provide personal services to the third party. The important point is that the debtor has entered into a contract and certain rights to payment have arisen therefrom. Even though this right to payment is not for goods provided, it is still an account.

Arizona law defines a general intangible through the use of terms of art, such as "goods" or "accounts" or other property defined by the *Uniform Commercial Code*. *Ariz.Rev.Stat.Ann.* § 47–9106 (West 1988). There are no Arizona cases which define what constitutes a general intangible. Certainly the definition does not include specificity. A general intangible is determined through a process of elimination. Therefore, this Court cannot conclude that given the lack of Arizona authority on point, it was not unreasonable for the Trustee to keep approx-

---

**34.** *Ariz.Rev.Stat.Ann.* § 47–9105(A)(3) (West 1990 & Supp.1994) defines "chattel paper" as:

a writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods. When a transaction is evidenced both by such a security agreement or a lease and by an instrument or a series of instruments, the group of writings taken together constitutes chattel paper.

**35.** Laws 1975, Ch. 65, § 13, effective January 1, 1976.

**36.** The Court also considered the definition of and classification of goods under the *Uniform Commercial Code.* *Ariz.Rev.Stat.Ann.* §§ 47–9105(A)(10) (West 1990 & Supp.1994) and 47–9109 (West 1988).

imately one third of the net BIA settlement proceeds and pay the balance to BA.

The parties have also cited this Court to decisions of other jurisdictions concerning the *Uniform Commercial Code* and to certain cases under federal law in resolving government contract disputes in support of their respective positions. The Court shall review these decisions.

The Debtor relies on the decision of *Bowlen v. Federal Deposit Ins. Corp.*, 815 P.2d 1013 (Colo.App.1991). Metro National Bank (hereinafter "Metro") was awarded a judgment jointly and severally against Patrick D. Bowlen (hereinafter "Bowlen") and Richard R. Landon (hereinafter "Landon"), who were business partners. Bowlen paid the judgment in full. *Id.* at 1014. Metro then assigned its judgment against Landon to Bowlen. Landon executed a promissory note in the principal amount of $100,000 in favor of Chancery National Bank (hereinafter "Chancery"). Landon also granted Chancery a security interest in any settlement proceeds received by Landon and Bowlen. Subsequently, in a different lawsuit, Bowlen and Landon obtained a judgment in their favor by settlement. A month later, Bowlen had a writ of garnishment issued to allow Bowlen to garnish that portion of the settlement proceeds to be received by Landon in payment of the Metro judgment assigned to Bowlen. *Id.*

The *Bowlen* court determined that "[t]he proceeds from the settlement agreement resulting from a claim against a third party are considered general intangibles under the *Uniform Commercial Code*." *Id.* at 1015 (citing *Board of County Comm'r v. Berkeley Village*, 40 Colo.App. 431, 580 P.2d 1251 (1978)). Chancery perfected its security interest in the settlement proceeds that Landon might receive, when it filed a financing statement with the Secretary of State. Bowlen, a judgement creditor, only became a lien creditor as to Landon upon the serving of the writ of garnishment. *Id.* Thus, Chancery had priority.

However, the *Bowlen* case is distinguishable. Chancery acquired a security interest in proceeds from a settlement. The *Bowlen* court focused on a priority dispute between a consensual lien creditor versus a judgment lien creditor. The *Bowlen* court did not consider a government contract which was subject to modification, and the distinction between an account and a general intangible. Therefore, the *Bowlen* decision is not dispositive of the issues before this Court.

Turning to the government contract decisions, this Court has reviewed the decision of *In re Boston Shipyard Corp.*, 886 F.2d 451 (1st Cir.1989). In *Boston Shipyard*, a settlement was reached for amounts due under a contract and for disruption of work caused by the federal government. *Id.* at 453–54. Although the Eleventh Circuit found that there was sufficient consideration to support the modification of the contract, the *Boston Shipyard* court looked to the substance of the modification. *Id.* at 454. The *Boston Shipyard* court concluded that the settlement was a release of claims against the United States Military Sealift Command (hereinafter "MSC") and that it was also an accord and satisfaction of the possible claims, including any claims resulting from delay and disruption. *Id.* Although the *Boston Shipyard* court did not consider the issue of whether the settlement proceeds were an account or general intangible, the court discussed the contract rules that came into play when a person became a contractor with the federal government. The *Boston Shipyard* court stated:

> Financial incapacity, however, is generally not considered beyond the contractor's control. [cite omitted] This rule is understandable, as a contractor who makes and then accepts a bid should have the financial ability to perform. But, as with most rules, there are always exceptions. Thus, if the financial problems are caused by factors beyond the contractor's control, or by the government's actions themselves, then the contractor's default may be justified.

*Id.* at 457. The *Boston Shipyard* court ultimately concluded that the contractor's default was a result of the thin capitalization of the contractor. The court then indicated that cost overruns, *not* caused by the contractor, were to be handled according to the clauses of the contract. *Id.* at 458. In such

cases, the cost overruns would cause a modification of the contract.

In the decision of *Merchants Nat'l. Bank of Mobile v. Ching,* 681 F.2d 1383 (11th Cir.1982),[37] Merchants National Bank of Mobile (hereinafter "Bank") agreed to finance Maritime Coatings, Inc.'s (hereinafter "Maritime") operations, if Maritime executed promissory notes, security agreements and financing statements to grant the Bank a security interest in certain accounts. *Id.* at 1384. Maritime granted the Bank a perfected security interest in all accounts in existence and thereafter acquired and in all contract rights assigned by Maritime to the Bank, and all proceeds of such accounts and contract rights. *Id.*

Subsequently Maritime and Newport News entered into two separate contracts. Under the first contract, Maritime was owed the retainages under the contract for sandblasting work which had been completed and for coating two hulls. *Id.* However, one hull required rework by Maritime; thus, there were invoices for the reworking of the hull and for additional costs incurred as a result. *Id.* at 1384–85. The second contract pertained to sandblasting and coating seventeen tank tops. *Id.* at 1385. Maritime performed the work on three of the tank tops. Newport News performed the work on the remaining fourteen tank tops, thus preventing Maritime from performing under the second contract. Maritime sought to recover anticipated profits, as if it had performed the work.

The Bank subsequently filed suit to recover against Newport News, claiming that the Bank had a perfected security interest on "all receivables, choses in action and causes of action owned by Maritime against Newport News." Thus, the Bank argued it was able to prosecute such claims. *Id.*

Ultimately, the Eleventh Circuit had to determine whether Maritime's claims for rework, forklift rental and other extended job costs constituted an account or general intangible. *Id.* at 1386. The *Merchants National* court reviewed each claim to determine how it arose. First, the Eleventh Circuit determined that the rework was covered under Modification No. 5 of the contract. The Court stated that the reason for the rework, such as negligence, was irrelevant. The key was whether the contract authorized the rework. Hence, the Court stated the rework was an account. *Id.* at 1387.

Second, the *Merchants National* court concluded that the cost of Maritime's renting a forklift constituted damages from a breach of contract. *Id.* at 1388. This cost was classified as a general intangible since "[a]n account does not include liability for unliquidated damages resulting from a breach of contract." *Id.*

Finally, the Eleventh Circuit concluded that the claim for lost profits was not derived from the contract. This claim arose from the breach of the contract. Therefore, it was a general intangible. *Id.*

Thus, the Eleventh Circuit concluded that those items which were provided for under the contract constituted an account.

In the decision of *Atlantic State Const., Inc. v. Hand, Arendall, et al.,* 892 F.2d 1530 (11th Cir.1990), the United States Navy and Atlantic States Construction, Inc. entered into a contract, which provided for an equitable adjustment to the price quoted in the contract should the federal government unreasonably delay performance. *Id.* at 1532. Atlantic entered into a separate contract with Process and Systems Engineering Company, Inc. (hereinafter "P & S"), a subcontractor. The contract between Atlantic and P & S contained an exculpatory clause, whereby P & S agreed not to hold Atlantic liable for any delays on the projects. *Id.* The Navy's contracting officer initially suspended work under the Navy contract. The work under

**37.** The Eleventh Circuit affirmed the decision of the United States District Court in part, and reversed the decision in part. As a result, the District Court remanded the rework claim to the Bankruptcy Court. *Merchants Nat'l. Bank of Mobile v. Ching,* 24 B.R. 900 (D.Ala.1982). When Merchants National Bank subsequently attempted to assert its rights before the Bankruptcy Court on the rework claim, and to assert a claim against certain settlement proceeds as a result of the claim, the Bankruptcy Court denied the Bank's motion to amend its complaint. This issue was independently appealed to the Eleventh Circuit. *Merchants Nat'l. Bank of Mobile v. Ching (In re Maritime Coatings, Inc.),* 748 F.2d 1483 (11th Cir.1984).

the Navy contract and the Atlantic and P & S contract was later resumed and P & S submitted a certified claim to Atlantic seeking compensation for additional expenses. Atlantic submitted the claim to the Navy and sought an equitable adjustment under the Navy contract. *Id.* The Navy agreed to an equitable adjustment and stated that a certain portion of the adjustment would be paid by Atlantic to P & S. *Id.* at 1532–33. After the Navy paid Atlantic, three separate parties made a claim to P & S's portion of the funds, including Hand, Arendall. *Id.* at 1533.

The *Atlantic* court had to determine at what point did the P & S account arise. *Id.* at 1536. The *Atlantic* court reviewed the contract between Atlantic and P & S, and determined that it incorporated the terms of the contract between the Navy and Atlantic, that Atlantic was not absolved from its responsibility to P & S, and that Atlantic, the prime contractor, was liable to P & S, the subcontractor, for equitable adjustments. *Id.* at 1537–40. The *Atlantic* court further determined that the exculpatory clause in the Atlantic and P & S contract did not impair P & S' right to payment. The *Atlantic* court found that the P & S account came into existence, at the latest, when P & S completed its performance under its contract with Atlantic. *Id.* At that time, P & S was entitled to an adjustment in its contract with Atlantic for the additional costs incurred by P & S.

The *Atlantic* and *Merchants National* decisions both support BA's position. In both of these cases, the Eleventh Circuit reviewed the contract to determine if the claim arose under the contract; that is, were there provisions in the contract which provided for adjustments in the contract price? If so, any adjustments were a part of the account or contract right.

In this case, the Debtor's Contract provided for equitable adjustments if (1) there was a variation in estimated quantity for the roadway of more than 15 percent (15%); (2) there was a suspension, delay, or interruption of work caused by an act of the BIA contracting officer in the administration of the contract or the contracting officer failed to act within a specified time; and (3) the Debtor encountered differing site conditions, if written notice was provided by the Debtor prior to the final payment under the Contract.[38] Furthermore, under the Changes Clause of the Contract, the contracting officer was allowed to make changes under the Contract. If the changes increased the Debtor's costs or time required for performance, then the contracting officer was to make an equitable adjustment and modify the Contract.[39]

█ At the time of the settlement, the BIA prepared a memorandum justifying internally why a substantial portion of the claim of the Debtor's bankruptcy estate should be paid.[40] The BIA eventually conceded that there were (1) defective specifications;[41] (2) differing site conditions which

---

**38.** *See* Debtor's Exhibit No. 1.

**39.** *See* Debtor's Exhibit No. 1, p. 25. Subsection 44(d) states:

(d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, **the Contracting Officer shall make an equitable adjustment and modify the contract in writing.** However, except for a "proposal for adjustment" ... based on defective specifications, no proposal for any change under paragraph (b) above shall be allowed for any costs incurred more than 20 days before the Contractor gives written notice as required. **In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably**

incurred by the Contractor in attempting to comply with the defective specifications. (Emphasis added).

**40.** *See* Debtor's Exhibit No. 16 entitled "Settlement–Record of Negotiation."

**41.** *See* Debtor's Exhibit 16, pp. 2–3 stating in part:

The Contracting Officer's decision implies some Government liability; however there is no finding and decision whether the specifications were defective or not, hence a breach. The evidence reflects innumerable engineering changes and staking errors. Some of these were never documented as changes to the contract, but are aptly pointed out in the Contracting Officer's decision. . . .
Were the specifications defective? The evidence supports that there were defects which

were not promptly investigated; [42] and (3) government caused delays.[43] The recommendation of the BIA was that the Government should settle with the bankruptcy estate for the sum of $550,000.[44] The BIA actually increased the amount of the settlement, paying the Trustee the sum of $613,286.50.

The government decided to settle the controversy pursuant to the Changes Clause of the Contract, since the Debtor/bankruptcy estate encountered delays and differing site conditions and the government provided defective specifications, which all arose under the Contract.

Based upon the analysis presented in *Atlantic States Const. Inc. v. Hand, Arendall, et al.,* 892 F.2d 1530 (11th Cir.1990), and *Merchants Nat'l Bank of Mobile v. Ching,* 681 F.2d 1383 (11th Cir.1982), this Court concludes that an equitable adjustment arises under the contract. Thus, any payment to the Debtor/bankruptcy estate is in the nature of an account or contract right.

This analysis is further supported by the Debtor's special counsel, who was an expert witness at the trial. The Debtor did not question the expert's qualifications or expertise in the area of construction and commercial litigation. The expert testified as to the history, process, and applicable law concerning the resolution of federal government contract disputes.[45] The expert also testified as

to the events leading up to, and surrounding, the settlement with the BIA.[46] The expert testified that the payment made to the Debtor/bankruptcy estate pursuant to the settlement of the litigation against the BIA was a payment *under the Contract,* not a settlement for a breach of contract.[47] Based upon this testimony, the Trustee and BA have presented a strong argument that the BIA proceeds constitute an account, not a general intangible.

Because of the foregoing analysis, the Court concludes that it was reasonable for the Trustee to settle the controversy with BA. The Trustee, by no means, could necessarily succeed on a motion for summary judgment as the Debtor attempted to argue.

This Court will approve the settlement entered into between the Trustee and BA. The Trustee and/or BA will submit an appropriate form of order, which is consistent with this Opinion.

---

causes many field changes and delays. How much did it cost the Contractor is a matter of quantum.

42. *See* Debtor's Exhibit No. 16, p. 4, stating:

Was there a differing site condition? The original decision says the encountered conditions were no different than as indicated or should at least have been anticipated based on a reasonable site visit or were the kind of work ordinarily encountered in projects of this kind. Thus, the cost and effort in excavating rock falls within the scope of work required by the contract. Yet, the Government acknowledged that compensation was due for excess rock removal and extra time was allowed. All in all, the Government's actions, support a differing site condition. How much did it cost the Contractor? This is a matter of quantum and is difficult to contest as the Government did not promptly investigate the alleged differing site conditions until after it was too late to accurately assess the cost.

43. *See* Debtor's Exhibit No. 16, p. 5, providing, in part:

*Government-caused Delays—* ...
The Contracting Officer agreed that there were Government-caused delays due to engineering changes and staking errors which were supported by documentation. The amount offered the Contractor was $5,129.41 and 1 days [sic] reduction in liquidated damages. The Contractor claimed for 34 days at $11,895.00 for a total of $404,430.00.
Since the Government already admitted liability, the only question is one of quantum.

44. *See* Debtor's Exhibit No. 16, p. 6.

45. *See* Reporter's Transcript, dated June 7, 1994 (hereinafter "June 7 Transcript"), pp. 7–13.

46. *See* June 7 Transcript, pp. 13–20.

47. *See* June 7 Transcript, p. 21, line 14 through p. 22, line 1.