Toomey, J.
This is a case of a business deal gone sour. A. Michael Hills (Hills), former minority shareholder of Herb Chambers of Auburn, Inc. (HCA), brings this direct and derivative action against his former business partner, Herbert G. Chambers (Chambers), HCA and Jennings Road Management Corporation (Jennings Road) (collectively the “defendants”) to recover for, inter alia, lost wages, lost profits, the loss of his opportunity to participate in corporate affairs and the loss of his interest in HCA.
In his nine-count amended complaint, Hills alleges that Chambers, as majority shareholder, breached his fiduciary duty of utmost good faith and fair dealing (Count I), and, with HCA, wrongfully terminated him (Count II) in violation of the implied covenant of good faith and fair dealing (Count III). Hills further alleges that Chambers and Jennings Road tortiously interfered with his contractual relationship with HCA (Count IV), and made misrepresentations of material fact to his prejudice (Count V).[2] Finally, Hills claims that the defendants’ aforementioned conduct not only intentionally caused him to suffer emotional distress (Count VII), but also, because of its extreme and out *76 rageous character, violated G.L.c. 93A (Count VIII). In the alternative, Hills brings a derivative cause of action on behalf of HCA to recover wrongfully diverted corporate profits. (Count IX.)
In addition to denying Hills’ major allegations, the defendants asserted an affirmative defense of release. Mass.R.Civ.P. 8(c). The defendants now move, pursuant to Mass.R.Civ.P. 56(c), for summary judgment upon all counts. For the reasons that follow, the motion is ALLOWED.
BACKGROUND
The undisputed material facts, when viewed in a light most favorable to the plaintiff, are as follows.
A.Hills and the Creation of Mid-State Hyundai and Toyota
In 1987, Hills, a Dartmouth College graduate with an M.B.A. from Boston University, left his job at Hyundai Motor America to join three Ford dealers, Kenneth Fosdick (Fosdick), David Aronson (Aronson) and Lionel Lamoureux (Lamoureux), who were establishing a new Hyundai dealership in Auburn. Mid-State Hyundai was incorporated to operate the new dealership; Hills was designated the on-site General Manager, and, at some point, paid $58,000 for a 29% stock interest in Mid-State. In addition, Hills joined Fosdick and Aronson in the ownership of the associated real estate.
In 1988, after a facility was built, Mid-State opened for business. For the year, Mid-State showed a slight ($248.00) net profit before taxes. Actually, the results were somewhat better. The shareholders, including Hills, received a total of $200,000 in year-end bonuses that year. Mid-State, however, actually needed the so-called “net profit” for operations, and, accordingly, the shareholders immediately loaned their “bonuses” back to the corporation.
In 1989, Mid-State’s business began to soften, and, by year’s end, it had lost $98,000. Mid-State’s problems continued into 1990, losing an additional $159,465. Not only was Mid-State unable to repay the 1988 shareholder loans, but the shareholders also had to make additional capital contributions in 1989 and 1990, in the “six figures,” so that Mid-State could cover cash shortfalls, meet expenses and otherwise continue as a going concern.
In 1990, based on Hills’ recommendation, Mid-State applied for a Toyota franchise. Hills’ rationale was that, because Hyundai was a relatively weak and low-market franchise, Mid-State would have great difficulty surviving as a stand-alone Hyundai operation. Toyota, in contrast, had far more positive potential. To add Toyota to Hyundai would, in Hills’ view, better the prospects for Mid-State’s survival and prosperity.
B.Hills’ Business Partners Bail Out
In 1991, Toyota issued a “preliminary approval” of Mid-State’s application, subject to some “minor contingencies.” In order to be accepted as a Toyota franchisee, however, the shareholders had to invest hundreds of thousands of new dollars in Mid-State. Because Fosdick, Aronson and Lamoureux were unwilling or unable to make any additional investments, they decided that they no longer wished to pursue the Toyota franchise. Fosdick, Aronson and Lamoureux agreed that Hills should market Mid-State and its underlying real estate. The three sought to abandon the Mid-State ship to whatever destiny it faced with Hill at its helm.
The situation became desperate for both Hills and Mid-State; Hills’ investment and job were in jeopardy, while Mid-State’s future viability became increasingly more uncertain. Not only would Hills have to find ' someone willing to buy out his co-venturers and join him in the ownership of Mid-State, but that person would also have to be acceptable to Toyota and have the resources necessary to exploit the Toyota opportunity. Moreover, Hills was pressed by a potentially fatal condition: Toyota’s “preliminary approval” was time-limited. Unless Mid-State could acquire the Toyota franchise relatively quickly, Mid-State would remain a stand-alone Hyundai franchise with a dim economic future, exacerbated by defecting principals.
C.Hills Contacts Chambers and á Deal Is Struck
In search of rescue, Hills contacted the defendant, Herbert G. Chambers (Chambers), to invite his involvement in Mid-State. Hills and Chambers rapidly reached an understanding. Hills, Lamoureux, Fosdick and Aronson agreed to transfer Mid-State’s hard assets, its Hyundai franchise (pending approval by Hyundai), and its rights to the “preliminary approval” of the Toyota franchise. In return, Chambers agreed, subject to obtaining the Toyota franchise, to pay Mid-State $120,000 for the hard assets, assume the existing mortgages on the property, totaling approximately $1,650,000, and pay Hills, Lamoureaux, Fosdick and Aronson $100,000 as “blue sky” for the goodwill of Mid-State.[3]
On May 31, 1991, Chambers incorporated the defendant, Herb Chambers of Auburn, Inc. (HCA), to acquire Mid-State’s assets, to operate the Hyundai dealership and to open the Toyota franchise. Now at the wheel as president and treasurer of HCA, Chambers acknowledged that it was his intention to invest whatever money was required to tack his corporate vessel in the direction of profitability.
D.The Chambers/Hills Arrangements
In connection with the Mid-State/Chambers transaction, Hills agreed to serve as General Manager for HCA. Chambers and Hills, who was represented by counsel, then negotiated and executed a series of intertwined agreements, including an Employment Agreement, a Shareholder Agreement, and a Stock Pledge Agreement. We shall describe each in turn.
*77 1. The Shareholders Agreement: The Shareholders Agreement, executed on October 1, 1991, provided, in relevant part, that Chambers would pay $231,460 for his 71% (142 shares) interest, and Hills would pay $94,540 for his 29% (58 shares) interest.[4] Because Hills lacked the resources to pay for his shares, Chambers loaned him the entire purchase price.[5] Chambers agreed not to draw a salary directly from HCA,[6] while Hills agreed to an annual salary, as set forth in his Employment Agreement, infra.[7]
Management fees were also a material part of the Shareholders Agreement. Specifically, and despite Hills’ initial reservations and protest, the parties agreed that
[HCA] shall retain the services of Jennings Road Management Corp. (sic) to advise and consult with [HCA] and its officers and directors, and shall pay a consulting fee of $23,500 per month for these services.
(Emphasis added.)[8] Lastly, the parties agreed on a mandatory cross-purchase provision which obligated Hills to sell, and HCA to buy, Hills’ shares in the event his employment ended. Any sums Hills received in exchange for his shares were to be applied to the repayment of any money he had borrowed from Chambers.
2. The Employment Agreement: Pursuant to the terms of the Employment Agreement, HCA was to pay Hills $60,000, as annual salary, plus benefits. The Agreement extended for three years, ending on December 31, 1994. Thereafter, Hills’ employment was to automatically continue from year to year unless either party provided prior written notice to the contrary. Under the Employment Agreement, HCA was also afforded the “elective” right to terminate Hills upon sixty (60) days prior written notice, or immediately upon “just cause.” The Employment Agreement also contained a so-called “Stock Repurchase” provision that mirrored that set forth above in the Shareholder Agreement.
3. The Other Agreements: Hills and Chambers also executed two other agreements on October 1, 1991, to wit, a Stock Pledge Agreement documenting Hills’ application of stock in HCA as security for Chambers’ loan enabling Hills to buy 29% thereof, and a Promissory Note evidencing the $94,540 Chambers’ loan. The term of the Note was three (3) years. Moreover, the Note vested Chambers with the right to declare the entire outstanding principal balance, and all interest and late charges, immediately due and payable upon the occurrence of certain specified events, the most significant of which was Hills’ “(h) termination for any reason” and “(i) [Hills’] ceasing for any reason to be a stockholder of [HCA].”[9]
E. Business Is Less Profitable than Anticipated — Tensions Mount
HCA began operations in October 1991 with Hills as General Manager. During his term, Hills industriously attempted to build a foundation for the Toyota portion of the business and to improve the struggling Hyundai dealership. And, on many occasions, Hills was “praised” for his “team” and “continued" efforts and performance. Nonetheless, notwithstanding the synergy of Hills’ industry and Jennings Road’s special consulting services, HCA lost money in almost every month of operation; the deficit, in toto, was $633,748 by the end of 1992.[10]
To cover those losses and prevent even larger ones, the shareholders, pursuant to the Shareholders Agreement,[11] made additional capital contributions to HCA, totaling $964,234, between March and November 1992. Because Hills lacked the capital to contribute his portion to HCA, and complained about having further to indebt himself, Chambers loaned him the money — over $290,000. The “1992 loans” were not just for the purpose of paying the Jennings Road management fee. The loans were also needed for operational expenses, viz, to maintain an adequate inventory of used cars, meet regular obligations, cover checks, stay current on payables, meet operating demands of the business and satisfy Toyota’s requirements concerning minimum working capital.
At about this time, an “uneasiness” entered the Hills/Chambers relationship.
F. The Events of January 8 and 11, 1993
On Friday, January 8, 1993, Bruce Spatz (Spatz), a vice-president and employee of Jennings Road, and an officer of HCA, telephoned Hills and explained to him that Chambers wanted him to agree, inter alia, (1) to terminate his Employment Agreement, effective immediately, and become an at-will employee, (2) to terminate the Shareholders Agreement and the Stock Pledge Agreement, and transfer his 58 shares of common capital stock in HCA to Chambers, and, most importantly, (3) to execute a release and covenant not to sue Chambers and HCA.
In exchange for Hills’ agreeing to modify the foregoing Agreements, Spatz informed Hills that Chambers would cancel and otherwise forgive all indebtedness owed by Hills in the aggregate principal amount of $374,168, together with interest, as evidenced by the promissory notes. Hills told Spatz that he wanted to “think about it.”
Three days later, on Monday, January 11, 1993, Spatz appeared at the dealership, informed Hills that he had with him all the legal documents necessary to effect Chambers’ desires and presented them to Hills for his review and execution. Hills read and faxed the documents to his attorney that day and discussed with counsel their ramifications. At some point later in the day, Chambers called to check on the progress of the discussions and spoke to Hills. Chambers informed Hills that “it” was not working, that he was very dissatisfied with the current arrangements, and that he wanted Hills to sign the documents.
*78 Although reluctant, Hills signed an agreement {viz, a letter purportedly modifying the Employment, Shareholder and Stock Pledge Agreements) (hereinafter referred to as the “January 11, 1993 Agreement”) that effectively (1) terminated his contractual employment (converting him into an “employee-at-will”), (2) obligated him to surrender his stock and ownership in HCA, and (3) waived all claims against Chambers and HCA.[12] Hills’ salary, however, continued unimpeded as did his right to retain 29% of HCA’s profits.
G. Events Thereafter
On February 12, 1993,° Chambers fired Hills. Ten days later, Hills obtained a job as the general manager of Acton Toyota. His compensation package from Acton Toyota included a weekly salary of $1,200.00, seven and one half (7V2%) percent of the net profit and an annual bonus of ten (10%) percent of the increase from the prior year.
On January 10, 1996, almost three years later, Hills filed this action to recover lost wages, lost profits, the loss of his ability to participate in the corporate affairs and the loss of his interest in HCA. Up until that time, Hills had never made any effort to disavow the January 11, 1993 Agreement. He has also never offered to repay or reinstate the debt that was cancelled by the January 11,1993 Agreement.[13]
The defendants now move for summary judgment arguing that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. Specifically, they contend, inter alia, that the January *11, 1993 Agreement effectively and validly released any claims Hills may have had against Chambers and HCA. Hills does not deny the existence of the January 11, 1993 Agreement, but rather contends that there are disputes of material fact about whether the release is rendered unenforceable because it was procured by way of fraud and economic duress. Defendants respond that the undisputed facts do not erode the proposition that the release is fully effective and insulates them from liability. For the reasons that follow, this court finds that the defendants have the better of the argument.
DISCUSSION I. Standard of Review
The function of summary judgment is to “pierce the boilerplate of the pleadings and assay the parties’ proof in an effort to determine whether trial is actually required.” Harris v. Harvard Pilgrim Health Care, Inc., 20 F.Sup.2d 143, 146-47 (D.Mass. 1998), citing McIntosh v. Antonino, 71 F.3d 29, 33 (1st Cir. 1995). To survive the swing of the defendants’ summary judgment axe, Mack v. Great Atlantic and Pacific Tea Co. Inc., 871 F.2d 179, 181 (1st Cir. 1989), Hills must establish that there exists a genuine issue of material fact requiring a trial. See Cassesso v. Comm'r of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). In determining whether Hills has met that burden, this court must determine whether, viewing the entire record in its light most flattering to him, any further exploration of the facts is necessary for resolution of the complaint. See McKenzie v. Brigham & Women’s Hosp., 405 Mass. 432, 437-38 (1989); Michaelson v. Digital Financial Servs., 167 F.3d 715, 720 (1st Cir. 1999) (same). Kourovacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Giacalone v. I.E.S., Inc., Civil Action No. 97-4666, 10 Mass. L. Rptr. 209, 1999 WL 513898 (Mass. Super. May 17, 1999).
Employing the litmus stated supra, this court will examine the January 11, 1993 Agreement to determine whether, on the record presented, there exist disputes of material fact evidencing, as Hills suggests, economic duress or fraud that eviscerates the unambiguous release and the covenant not to sue set forth therein. For the reasons stated infra, this court concludes that Hills has failed to satisfy his burden and that the defendants’ motion must be granted. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Kourouvacilis v. General Motors Corp., 410 Mass. at 716.
II. Analysis of the Defendants’ Motion A. Hills’ Individual Claims
The defendants' first salvo urges this court to recognize the validity of the January 11, 1993 Agreement, to acknowledge its controlling effect upon the litigation at bar, and to find that Hills effectively released, or agreed not to sue, the defendants for any claim he may have had “from the beginning of the world” to January II, 1993.[14]
As a preliminary matter, this court notes that Hills neither disputes the terms of the January 11, 1993 Agreement nor denies that it constituted a facially effective, written modification of the Shareholder’s Agreement, Hills’ Employment Agreement, the Stock Pledge Agreement and the various Promissory Notes executed by Hills and Chambers. Moreover, Hills does not dispute that the multifaceted contractual modification was supported by good and valuable consideration, to wit, his release of all claims in exchange for Chambers’ cancellation and forgiveness of all Hills’ contractual indebtedness in the aggregate principal amount of $374,168.00. Thus, unless some relevant exception appears, Massachusetts law requires this court to enforce specifically the January 11, 1993 Agreement. See Lawrence-Lynch Corp. v. Dept. of Environmental Management, 392 Mass. 681, 682 (1984) (interpretation of unambiguous contract is question of law for court); Ferris v. Marriott Family Restaurants, Inc., 878 F.Sup. 273, 275 (D.Mass. 1994) (“(w)here the wording of a contract is unambiguous, the contract must be enforced according to its terms”).[15] No such exception is presented at bar.
Here, Hills argues that the release set forth in the Agreement is ineffective and should be avoided, not because of ambiguity or failure of consideration, but rather because he executed the January 11, 1993 *79 Agreement under economic duress, or, in the alternative, because he executed that agreement under the influence of fraudulent inducement. We discuss separately each basis for rescinding the Agreement, and, in effect, the release. For reasons set forth more fully below, both arguments fail as a matter of law.'
1. Economic Duress
In International Underwater Contractors, Inc. v. New England Tel. and Tel. Co., 8 Mass.App.Ct. 340 (1979), the Massachusetts Appeals Court articulated, in two forms, the test for determining “economic duress.” First, citing Professor Williston, the Court observed that a party must show that (1) he has been the victim of a wrongful or unlawful act or threat, (2) such act or threat deprived him of his “unfettered will,” and (3), as a result, “the party threatened [has been] compelled to make a disproportionate exchange of values.” Id. at 342, quoting 13 W. Jaegar, Williston on Contracts §1617, at 704 (3d Ed. 1970). Second, the Court described the elements of economic duress in the following terms:
(1) That one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party . . . Merely taking advantage of another’s financial difficulty is not duress. Rather the person alleging financial difficulty must allege that it was contributed to or caused by the one accused of coercion . . . Thus in order to substantiate the allegation of economic duress or business compulsion . . . there must be a showing of acts of the part of the defendant which produced (the financial embarrassment). The assertion of duress must be proved by evidence that the duress resulted from the defendant’s wrongful and oppressive conduct and not by plaintiffs necessities.
Id. at 342 (internal quotation marks and citations omitted).
International Underwater further teaches that, when examining allegations of economic duress, the reviewing court should consider “the unequal bargaining power of the parties (both in terms of their comparative size and resources as well as the financial difficulties into which the plaintiff has fallen, allegedly because of the defendant’s acts),” and the disparity, if any, between the offer of settlement and the plaintiffs’ alleged sacrifice. Id. at 346. Whether, as here, the parties dealt with one another at arms’ length through independent counsel may also be a relevant consideration. See Ismert and Assoc., Inc. v. New England Mut. Life Ins. Co., 801 F.2d 536, 545 (1st Cir. 1986) (Maletz, J. dissenting).
Here, Hills argues that there are issues of material fact as to whether he executed the Agreement under economic duress. He asserts that the defendants had a “calculated plan to coerce [him] into accepting the settlement arrangement ... in exchange for retaining his job,” that ”[f]aced with immediate threat of the loss of his job and the intense pressure from Mr. Chambers . . . (he) signed [the January 11, 1993 Agreement],” and that ”[t]he defendants engineered the situation in such a way that [he] would face either instant poverty (loss of job which would trigger a call of the notes)-or execute the release.”
The First Circuit Court of Appeals considered a similar argument in Ismert and Assoc., Inc. v. New England Mut. Life Ins. Co., 801 F.2d 536 (1st Cir. 1986). In Ismert, the plaintiff, a tax consulting firm, entered into a marketing agreement with the defendant that was designed to promote and sell Ismert’s services. As part of that agreement, the defendant loaned Ismert money, and, in return, obtained an option to buy up to 50% of Ismert’s common stock. Id. at 537-38. After their relationship deteriorated, Ismert demanded more favorable repayment terms on the loan allegedly because the defendant’s actions caused Ismert to suffer financially. In return, however, the defendant required Ismert to execute a release to avert subsequent suit. After considerable negotiations, Ismert signed the release. When Ismert brought suit, the defendant asserted the release as an affirmative defense.[16] Id. at 537.
Justice Breyer writing the opinion for the Court, rejected Ismert’s claim of economic duress. In so doing, the Court purposefully refrained from addressing whether the defendant either exerted wrongful pressure on Ismert or caused its alleged precarious financial position. Instead, the Court focused on whether Ismert lacked any “real choice” or “feasible alternative” but to execute the release. The First Circuit found that because Ismert could have refused to repay the loan and then, after the defendant instituted legal proceedings, asserted its claims, or could have, alternatively, refused to sign the release and brought its own action against the defendant, leaving the defendant to counterclaim for repayment of the loan, Ismert was neither deprived of its “unfettered free will, nor was it forced to succumb to a ’’disproportionate exchange of values" sufficient to avoid the release. Id. at 550-51.
In the instant case, even if this court were persuaded that the defendants did, in fact, have a “calculated plan,” as Hills suggests, and that the circumstances touching upon Hills’ execution of the January 11, 1993 Agreement were the result of defendants’ wrongful acts, the law still requires Hills to present some probative and admissible evidence that the defendants’ acts deprived him of his unfettered free will and left him with “no real choice” or “no alternative” but to sign the January 11, 1993 Agreement. See HRPT Advisors, Inc. v. MacDonald, Levine, Jenkins & Co., P.C., 43 Mass.App.Ct. 613, 621 (1997); Madsen v. Erwin, 395 Mass. 715, 719 (1985); Community Nat'l Bank v. Dawes, 369 Mass. 550, 554 (1976). International Underwater, 8 Mass.App.Ct. at 342. This he has not done.
*80 As evidence of economic duress, Hills ostensibly relies on his deposition testimony which asserts that (1) “[Chambers] is a very imposing person and very threatening in his own way,” (2) in the absence of his execution of the January 11, 1993 Agreement (and concomitant release and covenant not to sue), Chambers "would have demanded,” that he immediately repay the “loans” (pursuant to the Employment, Shareholder, and Stock Transfer Agreements and the many Promissory Notes), and (3) such demand would have given him “a huge debt that would [have been] difficult to repay.” (Emphasis added.)[17] That “evidence” is not persuasive of economic duress.
At bottom, Hills urges this court to predict the future course of Chambers’ behavior, and then to hypothesize further the financial impact upon Hills, despite any evidence of Hills’ financial condition. Other than copies of scores of executed promissory notes, Hills proffers no other documents — no affidavits, no financial statements of any form, no personal tax records, no bankruptcy petitions, no dockets of pending actions against him, no memoranda of outstanding loans — demonstrating that, were he compelled to satisfy amounts owed to Chambers as a result of loans (in reality capital contributions made by Chambers to HCA on behalf of Hills), Hills would suffer disabling “financial embarrassment.” In short, the record is entirely bereft of any proof of either Hills’ imminent financial distress or any act or threat that precluded Hills’ exercise of an unfettered free will in connection with his execution of the January 11, 1993 Agreement. That vacuum in the evidence is fatal to plaintiffs’ cause.
Moreover, Hills had adequate alternatives to the January 11, 1993 Agreement available to him. As proposed by Ismert, Hills could have refused to sign the release, been fired and then brought suit. Or, he could have awaited suit by the holders of the notes and defended by proffering evidence of Chambers’ actions. That Hills may have felt rushed to sign the Agreement, or that, as he acknowledged, he was “not in the best of bargaining positions,” does not impugn the bargain he struck. See International Underwater Contractors, Inc. v. New England Tel. and Tel. Co., 8 Mass.App.Ct. at 342 (merely taking advantage of another’s financial difficulty is not duress). And, when we factor into the analysis Hills’ concession that his review of the January 11, 1993 Agreement had the benefit of counsel, his effort to avoid its consequences is decidedly lacking in merit.
Finally, given that Hills admits that HCA was continuing to lose money, the instant record does not suggest that Hills’ surrender of his interest in HCA, in exchange for Chambers’ cancellation of the various notes, worth at least $374,168, evidenced a “disproportionate exchange of values.” sufficient to vitiate the release by Hills. A reasonable fact finder could not, on the evidence at bar, return a verdict for the plaintiff.
2. Fraud
Massachusetts common law has long instructed that ”... a plaintiff seasonably may rescind a contract which he has been induced to enter into in reliance upon false and fraudulent representations as to material facts.” Elias Bros. Restaurants, . v. Acorn Enterprises, Inc., 831 F.Sup. 920, 927-28 (D.Mass. 1993), quoting McGrath v. C.T. Sherer Co., 291 Mass. 35, 58, 195 N.E. 913,-925 (1935). Contracts induced by fraudulent misrepresentations (or for that matter, the result of economic duress) are not, however, void ab initio; they are only voidable. Shaw’s Supermarkets, Inc. v. Delgiacco, 410 Mass. 840, 842 (1991) (contract based on fraudulent misrepresentations voidable, not void). See also Dorn v. Astra USA, 975 F.Sup. 388, 393 (D.Mass. 1997) (and cases cited) (contracts induced by duress voidable). See generally H. Alperin and L. Shubow, Summary oj Basic Law, 14 Mass. Practice §7.65 at 696-97 (1996 Ed.).
One wishing to avoid a voidable contract, such as the January 11, 1993 Agreement at bar, must, in some appropriate fashion, give notice that he or she chooses no longer to be obligated under the contract. Assuming arguendo, that the Agreement was voidable by reason of fraud, Hills was obligated seasonably to disavow his obligations thereunder. By failing so to do, he has ratified the January 11, 1993 Agreement and waived his right to avoid its effects. See In re Boston Shipyard Corp., 886 F.2d 451, 455 (1st. Cir. 1989).
In determining whether Hills’ conduct constitutes a ratification and consequent loss of the right to void, we are guided by the sentiments expressed by the Dorn court:
Ratification of a contract may be found under a variety of circumstances: (1) intentionally accepting benefits under the contract, (2) remaining silent or acquiescing in the contract for a period of time after having the opportunity to avoid it, or (3) recognizing the validity of the contract by acting upon it, performing under it, or affirmatively acknowledging it.
Dorn, 975 F.Sup. at 393, citing In re Boston Shipyard, supra at 455. Although Hills may have filed his lawsuit within the requisite limitations period, he ratified the January 11, 1993 Agreement in two ways — by waiting almost three years to disavow the Agreement and by accepting the benefit of his bargain. That ratification now precludes his present effort to void the Agreement.
As with any equitable remedy, “actions for rescission must be brought with reasonable promptness.” Elias Bros. Restaurants, Inc. v. Acorn Enterprises, Inc., 831 F.Sup. 920, 927-28 (D.Mass. 1993), quoting Solomon v. Birger, 19 Mass.App.Ct. 634, 638 (1985). Massachusetts law teaches that "(w]hat is a reasonable time depends on all the circumstances of the case.” Mathewson Corporation v. Allied Marine Industries, Inc., 827 F.2d 850, 853 (1st Cir. 1987), quoting *81 Powers, Inc. v. Wayside, Inc. of Falmouth. 343 Mass. 686, 691 (1962). Moreover,
[w]here the evidence is in dispute and open to different inferences, the question whether an act has been done within a reasonable time after the happening of a certain event is ordinarily a question of fact, but where . . . the facts are not in dispute the question becomes one of law.
Elias Bros. Restaurants, Inc., supra at 927-28, citing Powers, Inc., supra, 343 Mass. at 691, and Charles River Park, Inc. v. Boston Redevelopment Authority, 28 Mass.App.Ct. 795, 814 (1990).
Here, the record evidence is not in dispute. Hills made no effort to disavow the January 11, 1993 Agreement until he filed the action on January 10, 1996. Furthermore, because there is no evidence that Hills was deprived of any knowledge of the facts comprising the fraud, this court concludes that he has not exercised “reasonable promptness” in asserting his claim for rescission. See In re Boston Shipyard Corp., 886 F.2d at 455 (affirming grant of partial summary judgment and finding delay of over a year and a half unreasonable as a matter of law and thus evocative of ratification); Ismert and Associates, Inc., 801 F.2d at 550; Dorn, 975 F.Sup. at 394 (awarding defendant summary judgment and finding plaintiffs’ delays in bringing suit of between eleven and thirty-four months unreasonable as a matter of law and contract ratifying), and cases cited; Elias Bros. Restaurants, Inc., 831 F.Sup. at 927-28 (delay of over three years not sufficiently prompt to permit repudiation of contract).
Additionally, there is no evidence that, in the almost three years after he executed the Agreement, Hills ever attempted to restore the status quo ante, that is, to repay all or part of his debt. See Dorn, supra at 393. By failing so to restore, Hills was clearly financially benefited.
In sum, the undisputed facts demonstrate that Hills should not, after having accepted the benefit of the release, be permitted to turn back the clock, rethink his possibly ill-conceived release, and otherwise escape the burdens of the January 11,1993 Agreement. To find otherwise would, under the facts presented, reward one who is content to profit from a voidable deal and who seeks avoidance only when economic reversal appears on the scene; such an evasion is contrary to law.
There being no genuine issues of material fact presented by the Rule 56 record at bar and defendants’ having demonstrated that they are entitled to judgment as a matter of law, summary judgment shall enter in their favor on all claims made by Hills in his individual capacity.
B. Hills’ Derivative Claims
As a preliminary matter, before filing a derivative action on behalf of a corporation, a plaintiff “must [generally] establish that all available means to obtain relief through the corporation itself are exhausted by making demand on the corporation’s board of directors to prosecute litigation.” Harhen v. Brown, 431 Mass. 838. 844 (2000) (internal quotation marks and citations omitted). In some instances, however, “if a majority of directors are alleged to have participated in wrongdoing, or are otherwise interested, a plaintiff may seek to have the demand on the board excused as futile. This is referred to as a "demand excused" case. Id., citing Bartlett v. New York, N.H. & H.R.R., 221 Mass. 530, 534-35 (1915).
At bar, Hills contends that, because Chambers is the sole stockholder, any demand to bring suit against either himself or Jennings Road on behalf of HCA, would be futile. Even assuming arguendo that Hills presents a “demand excused case,” his derivative action must still fail. Although he may have been a shareholder “at a time when Chambers undertook his initial wrongful acts,” it is undisputed that Hills was not a shareholder at the time this action was brought: he surrendered his 29% equity interest in HCA and transferred his stock to Chambers prior to executing the January 11, 1993 Agreement. That decision was fatal to the underlying derivative action claim. See Schaeffer v. Cohen, 405 Mass. 506, 513 (1989) (finding plaintiff must be a shareholder of the allegedly aggrieved corporation at the inception of the action and affirming award of judgment for defendant notwithstanding the verdict on basis that plaintiff lacked standing). Compare Samia v. Central Oil Co. of Worcester, 339 Mass. 101, 111 (1959) (finding plaintiffs had standing because they appeared on corporate records as shareholders when they brought suit).
Summary judgment shall, accordingly, enter for the defendants upon all counts asserted on behalf of HCA.
ORDER
For the reasons set forth above, the defendants’ Motion for Summary Judgment is ALLOWED.

Count VI alleging defamation has not been addressed by the parties. Furthermore, given the undisputed record before me, and as asserted by the defendants in their answer, this court assumes that Count VI has been withdrawn.

The 1988, 1989 and 1990 “loans” from the shareholders were never repaid.

The Shareholders Agreement further provided that Hills and Chambers would make additional capital contributions, commensurate with their respective ownership interests, to the Corporation “in the event... it becomes necessary.”

The parties also agreed that Hills could subsequently, if the need arose, borrow from Chambers “any monies necessary to be contributed” to HCA. It is unclear why Chambers “offered” Hills a 29% stake in the venture, if, as acknowledged by Chambers under oath, he “didn’t need Mike Hills for his financial investment in the business [HCA].” Based on the record presented, and the reasonable inferences drawn therefrom, this court assumes that Chambers needed Hills, as general manager, to have an ownership interest in HCA in order to obtain the Toyota franchise. And, given that Chambers’ purchase of Mid-State’s assets was conditional *82 upon obtaining such franchise, Hills likewise needed to become a minority shareholder (i.e. have an ownership interest) to secure his rescue by Chambers. This was, at best, a symbiotic relationship infected by a gross imbalance in economic power.

Rather, Chambers was to be paid from the management fees (discussed infra) that HCA paid to Jennings Road. Chambers also had the potential of receiving profits from HCA at the end of the year.

There is no evidence that Chambers enjoyed a similar “Employment Agreement” with HCA.

Chambers unilaterally set the management fees to be paid by Herb Chambers of Auburn, Inc. to Jennings Road. Although Hills had negotiated for a lower fee, Chambers would not budge. Chambers made the Jennings Road management contract a prerequisite for any deal. For purposes of the instant motion, this court assumes that Chambers wholly owned Jennings Road, and, as Hills suggests, used such management fees as “owner’s salary." Be that as it may, given Hills’ admitted execution of the release, discussed more fully infra, Chambers’ dealings with Jennings Road are not material.

Hills suggests that “the literal provisions of these intertwined agreements technically created the ability to terminate Mr. Hills’ employment without cause precipitating a divestiture of his ownership interest. If done quickly enough while HCA was in the start-up stage and not profitable, this approach could be arguably. . . used to eliminate Hills from any involvement in this enterprise as well as result in a return of his stock in HCA for little or no value.” Upon deposition, however, Hills acknowledged that, at the inception of their relationship, “[he] wasn’t in the strongest of bargaining positions” while negotiating with Chambers. Furthermore, he neither disputes that he freely and voluntarily agreed to the underlying terms, nor alleges that he was forced to submit to “arguably” disfavorable terms. Therefore, this court is disinclined to permit Hills to play “Monday morning quarterback” and undo that for which he freely bargained.

It is unclear whether HCA would have lost money in 1991 and 1992 if it had not been required to pay Jennings Road a management consulting fee.

 xSee note 4, supra.

The release recited, in full, that Hills “hereby releasels] Herbert G. Chambers and [HCA] and its officers and directors (“Releases”) and forever discharge[si the said Releases and their successors and assigns, of any and all manner of action and actions, cause and causes of actions, suits, debts, sums of money, accounts, covenants, contracts, controversies, agreements, promises, damages, judgments, claims and demands whatsoever in law, or in equity, which against said Releases I ever had, nor have, or which I or my successors and assigns hereafter can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of these presents. ”

Although Hills denies that “until this case was filed [he] made no effort to disavow the January 11, 1993 agreement,” and further denies that “to this day, [he] has not offered to pay or even reinstate the debt that was cancelled by the January 11, 1993 Agreement,” Hills offers absolutely no evidence thereof. See HRPT Advisors, Inc. v. MacDonald, Levine, Jenkins & Co., P.C., 43 Mass.App.Ct. 613, 621 (1997); Madsen v. Erwin, 395 Mass. 715, 719 (1985); Community Nat’l Bank v. Dawes, 369 Mass. 550, 554 (1976) (to survive summary judgment nonmoving party must do more than “rest upon the mere allegations or denials of his pleading”).

Because this court finds the defendants' first assault on the plaintiffs’ case to be wholly dispositive in defendants’ favor, we need not consider the other grounds advanced by defendants in support of their motion.

Other cases further demonstrate that a release, in terms as broad as those now before this court, is to be given effect so long as it is supported, as Hills acknowledges, by consideration. Sloan v. Burrows, 357 Mass. 412, 415 (1970). This is especially true where, as here, the parties have dealt with one another at arms' length and upon independent legal advice, and “even if [they] did not have in mind all the wrongs which existed at the time of the release.” Naukeag Inn, Inc. v. Rideout, 351 Mass. 353, 356 (1966), and cases cited.

Prior to suit, the defendant had previously verified Ismert’s precarious financial position. Accordingly, the alleged “financial embarrassment” complained of, and required for a showing of economic duress, had already been established. The question for the court was thus limited to whether the defendant’s settlement offer was the only feasible alternative to bankruptcy. At bar, we only have Hills unsupported assertions that it would have been “difficult to repay” the loans if he did not sign the January 11, 1993 Agreement. Hills has offered no documentary evidence or sworn affidavit demonstrating that when he signed the Agreement he was forced to succumb to a “disproportionate exchange of values.”

It is undisputed, however, that Chambers did not “verbally threaten! ]” Hills. Furthermore, Hills does not assert that Chambers, or his agents, physically coerced or forced him to execute the January 11,1993 Agreement. It is also significant that Hills did not submit a supporting affidavit setting forth exactly how, if demand had been made, he would have been “financially embarrassed.”