Botsford, J.
Beginning in 1994, the plaintiff General Motors (GM) and the defendant Firepond, Inc. (Firepond) contracted for the licensing and provision of certain software and services by Firepond to GM. GM alleges in this case that Firepond violated the 1994 contract (as amended) by improperly repudiating it in March of 2000, and that in the circumstances presented by Firepond’s precipitous action, GM was forced by fraud and duress in April and May of 2000 to execute a release concerning Firepond’s contract repudiation and to enter into another set of agreements with Firepond relating to the continued software licensing and the provision of transition and other services. GM brings a number of claims relating to these allegations, including (among others) breach of contract, unjust enrichment, rescission and restitution, fraud, and violation of G.L.c. 93A.
While discovery is far from complete, Firepond has moved for summary judgment, arguing that GM, by its conduct following execution of the release and other agreements in April and May 2000, has ratified the terms of those 2000 agreements, including the release. Firepond also argues that even if it is not entitled to summary judgment on all GM’s claims on account of the release and ratification, a limitation of remedy provision in the 1994 contract limits the dollar amount that GM may recover on any of its claims. Finally, Firepond contends that if the case proceeds forward at all, Firepond is at least entitled to dismissal of the Chapter 93A count because the alleged conduct on which it is based did not occur “primarily and sub *529 stantially” in Massachusetts. GM opposes the motion on all grounds. For the following reasons, Firepond’s motion is denied.
BACKGROUND
The undisputed facts viewed in the light most favorable to GM are as follows. GM is one of the world’s largest automobile manufacturers. Firepond is a computer software development company. In 1994, GM and Firepond entered into a software licensing agreement (licensing agreement) under which Firepond licensed a software application to GM known as GM Prospec (Prospec). Prospec was a training and sales communication application that allows users to configure automobiles in a virtual environment by selecting make, model, and desired trim packages which then could be priced accurately. Prospec also assisted dealers in managing inventoiy and sales. As part of the licensing agreements Firepond provided software maintenance, web hosting services, and a help-desk line to field GM dealers’ qúestions concerning the Prospec program. Firepond also collected voluminous amounts of data related to vehicle specification, inventory, and sales from sources within GM on a regular basis which it then organized and incorporated into Prospec. The information collected was vital to providing GM with up-to-date inventory and pricing information. There is no dispute that at the time Firepond terminated the licensing agreement, GM was incapable of operating and maintaining Prospec in-house due to the software’s sophistication and GM’s lack of skilled personnel and infrastructure.
In 1998 the parties amended the licensing agreement to include Firepond’s Signature Plus software which supported GM BuyPower (BuyPower), an e-commerce initiative geared toward giving GM a greater consumer presence on the Internet through the GMB-uyPower.com website.[2] BuyPower had capabilities similar to Prospec although they were separate systems. BuyPower allowed GM consumers to visit the website and assemble virtual vehicles by selecting desired make, model, and options which then could be priced. It also directed customers to locations of dealers close by where the particular vehicle could be viewed, test-driven, and purchased. As was true of Prospec, with the BuyPower program, Firepond provided GM with data collection and processing, software maintenance, a troubleshooting hotline, and other ancillary services.
The 1998 amendment to the licensing agreement was a significant boon to Firepond, representing a major step in its evolution as a product-based company and a move toward building a long-term relationship with GM. In 1999, however, GM began seeking bids for the design and implementation of a single “global configurator” to replace Prospec and BuyP-ower. Firepond was not among those GM considered as a possible candidate. By its terms the licensing agreement was set to expire in December of 2000. In February of 2000, GM announced that one of Firepond’s competitors had been selected for the global configurator project.
On the day of GM’s announcement Firepond’s management issued an e-mail indicating retaliatory measures to “put the screws to GM” were in order. On March 21, 2000, Firepond’s counsel sent a letter from Firepond’s Massachusetts office to GM in Detroit, terminating the licensing agreement and falsely claiming GM was in material breach.[3] GM protested. Fire-pond threatened to shut down its services altogether if GM did not pay an additional $5 million to reestablish the licenses that were covered by the licensing agreement. Firepond also ordered its employees to cease communicating with GM and even instructed its bank not to accept any payments from GM.
With a costly stoppage of service imminent, GM had no other reasonable alternative than to enter into new contracts with Firepond — at a cost of approximately $9 million — so that GM could continue to use Prospec and BuyPower until the end of2000, the date on which the licensing agreement was to have ended. GM also executed a release. GM told Firepond at the time it executed these April and May 2000 agreements (including the release) (referred to hereafter collectively as “the 2000 agreements”) that it was doing so under duress, and considered them to be invalid and unenforceable.
Before it executed the May 2000 agreements, GM had decided on Oracle as the company to replace BuyPower, and was assessing whether Oracle could also develop replacement applications for Prospec. By July 2000, after recognizing that Oracle could not replace the Prospec program, GM recruited Chrome Data for that job. By September 2000, GM was forced to recognize that Oracle would be unable to complete its work on a new program to replace BuyPower, and so gave that job as well to Chrome Data. In October 2000, Chrome Data delivered its initial version of the new Internet and desktop software programs, called GM AutoBook. A near final version of the software was delivered and launched in the second half of December 2000. At this point, GM ceased using the Firepond Prospec or BuyPower applications, and Firepond ceased providing any services to GM. GM filed this suit ten months later in October 2001.
For purposes of its summary judgment only, Fire-pond does not contest that: (1) Firepond’s termination of the licensing agreement and 1998 amendment was a breach of these agreements, an anticipatory breach, and a breach of the implied covenant of good faith and fair dealing; (2) GM entered into the 2000 agreements under economic duress and was induced to do so by false statements and failure to disclose material facts; and (3) Firepond’s actions were unfair or deceptive trade practices within the meaning of G.L.c. 93A, although Firepond challenges the application of c. 93A to this case.
*530 DISCUSSION
1. Ratification of the 2000 Agreements, Including the Release
A release or other contract entered into under economic duress is not binding and may be avoided at the option of the party coerced. International Underwater Contractors, Inc., v. New England Telephone and Telegraph Co., 8 Mass.App.Ct. 340, 342 (1979). The person claiming duress must act promptly to repudiate the agreement or be deemed to have ratified or affirmed the contract. In re Boston Shipyard Corp., 886 F.2d 451, 455 (1st Cir. 1989). A parly may ratify by either “intentionally accepting the benefits under the contract; ... by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid; and ... by recognizing its validity ... by acting upon it, performing under it, or affirmatively acknowledging it.” Id. However, these actions or inactions are only relevant in determining ratification if taken after the coercion is removed. Ford v. Retirement Bd. of Lawrence, 315 Mass. 492, 496 (1944) (coerced party failed to act seasonably as soon as they were freed of constraint); Rosenbloom v. Kaplan, 273 Mass. 411, 417 (1930) (mortgage note allegedly executed under duress enforceable where mortgagor made payments of interest on note after alleged coercion or illegal influence had abated); Silsbee v. Parker, 171 Mass. 378, 381-82 (1898). See generally 7A. Corbin, Contracts, §28.8 (revised ed. 2002) (“Where coercion induces consent, the coerced parly’s behavior, once the coercion is removed, may constitute ratification”).
Since Firepond concedes for purposes of this motion that GM signed the release and other 2000 agreements under duress, the question is whether GM later ratified its prior coerced conduct. The moment when the economic duress dissipated serves as the critical point from which to begin to measure GM’s ratification. See Ford v. Retirement Bd of Lawrence, supra., 315 Mass. at 496. Firepond argues that when the 2000 contracts were executed, GM possessed the “means” to assume data collection and regular maintenance of Prospec and BuyPower and by choosing to continue to rely on Firepond for these services GM thereby ratified the contracts. GM disputes it had the “means,” capability, or resources to manage such a project in-house, and also disputes that it was able to find — before December of 2000 — another service provider who could develop and launch an adequate substitute for Firepond’s products and services. GM is in the business of manufacturing and selling automobiles, not hosting and maintaining web-based software programs. From the summary judgment record, it appears Prospec and BuyPower were sophisticated computer programs for which an experienced and technically savvy support staff facile with the program’s intricacies were needed to realize its true utility. The record, in sum, indicates questions of fact are genuinely at issue concerning whether or more particularly when GM should have been capable of servicing without Firepond the Prospec and BuyPower applications, or of replacing the applications.
Firepond also argues that in any event, GM’s ten-month delay in bringing this suit fails to meet the necessary standard of “reasonable promptness” and itself reflects a ratification of2000 agreements, including the release.
It is well settled actions for recission must be brought with reasonable promptness. See, e.g., Solomon v. Birger, 19 Mass.App.Ct. 634, 638 (1985). What is reasonably prompt depends on all the facts and circumstances of the case. See generally Powers, Inc. v. Wayside, Inc. of Falmouth, 343 Mass. 686, 691 (1962). GM’s economic duress unquestionably ended in late December 2000 when Chrome Data’s GMAutoBook was installed free of any bugs and Firepond ceased providing any services. But I cannot say as a matter of law that the ten-month interval between GM’s final dealings with Firepond and the filing of this case was per se unreasonable in terms of time, particularly in light of the fact that GM had apparently given Firepond consistent notice since April 2000 that it would pursue its claims for rescission and damages on account of duress.[4]
2. Enforcement of Damage Limitation Clause
The licensing agreement contains a clause that caps potential damages for conduct that renders one of the parties liable to the other:
Limitation of Remedy. The total liability of either party for all claims of any kind arising from, or related to, this Agreement, whether based on contract, tort (including, but not limited to, strict liability and negligence), warranty or on other legal or equitable grounds, shall be limited to general money damages and shall not exceed an amount equal to $500,000.[5]
Firepond seeks enforcement of this clause to limit any recovery that might be had by GM. GM responds that the clause is unenforceable because Firepond acted intentionally, wilfully, and in bad faith in breaching the licensing agreement, and also fraudulently induced GM to enter into the 2000 contracts.
Firepond is correct that as a general matter, limitation of remedy clauses of the type at issue here are valid and enforceable. See 11A. Corbin, Contracts §1068, p. 334 (interim ed. 2002) (a party “may later regret their assumption of the risks of non-performance in this manner; but the courts let them lie on the bed they made”). However, on the present record GM is entitled to pursue its contention that the clause does not foreclose every claim it brings. Under Michigan law,[6] a clause that limits a party’s liability to an agreed amount is generally enforceable provided such clause does not violate public policy. See Michigan National Bank v. St. Paul Fire & Marine Ins., 223 Mich.App. 19, 22, 566 N.W.2d 7, 9 (1997). For public policy reasons, Michigan allows a party to contract *531 against liability for damages caused by its own negligence, see id., but does not allow a party to so contract with respect to gross negligence, see Shelby Mutual Ins. Co. v. Grand Rapids, 6 Mich.App. 95, 148 N.W.2d 260, 262 (1967), or other wilful or wanton misconduct. See Thomas v. Atlantic C.L.R. Co., 201 F.2d 167, 170 (5th Cir. 1953), cited with approval by the court in Shelby Mutual.[7] Thus, the issue is what conduct falls within the ambit of wilful or wanton misconduct.
Application of these legal principles suggests that GM’s breach of contract claims (e.g., Counts I and II of the complaint) are certainly limited by the limitation of remedy clause, but again, I cannot conclude as matter of law at this point that GM’s claims for unjust enrichment, constructive trust (which is really a remedy and not a legal claim), rescission based on alleged extortion and coercion (Counts III, IV, V), and fraud (Count VIII), are so limited.[8] In light of Firepond’s summary judgment concessions concerning the nature of its conduct and the. materials placed in the record by GM, there are factual issues in dispute about whether Firepond did act intentionally and in bad faith, and generally in a manner that could render the limitation of remedy clause inoperable under Michigan law.[9]
3. Dismissal of 93A, §11 Claim
Firepond seeks dismissal of GM’s claim under G.L.c. 93A, §11, on the grounds that the alleged wrongful conduct did not occur “primarily and substantially” in Massachusetts. This is a defense on which Firepond, rather than GM, carries the burden of proof. G.L.c. 93A, §11, eighth para. In Kuwaiti Danish Computer Co., v. Digital Equipment Corp., 438 Mass. 459, 473 (2003), the Supreme Judicial Court stated that “§11 suggests an approach in which a judge should, after making findings of fact and after considering those findings in the context of the entire, §11 claim, determine whether the center of gravity of the circumstances that gave rise to the claim is primarily and substantially within the Commonwealth.” (Emphasis added.) Discovery has not closed in this case, and in any event the evidence in the summary judgment record leads me to conclude that Firepond has not met its burden of proving the locus of allegedly wrongful conduct to be a state other than Massachusetts.
ORDER
For the foregoing reasons, it is ordered that the defendant Firepond’s motion for summary judgment is denied.

Unless otherwise indicated, the term “licensing agreement” refers hereafter to the original 1994 contract and the 1998 amendment.

Flrepond does not concede generally that the termination of the licensing agreement was based on false premises. For purposes of this summary judgment motion, however, Fire-pond does not contest that its termination was an anticipatory breach of the agreement and a breach of the implied covenant of good faith and fair dealing. See p. 5 below.

The cases on which Firepond relies, In re Boston Shipyard Corp., supra, 886 F.2d at 455, Citizens Bank of Massachusetts v. Bishay, 1997 Mass.Super LEXIS 71 *35, 8 Mass. L. Rptr. 242, and Hills v. Chambers, 2000 Mass.Super LEXIS 634, *33-34, 12 Mass. L. Rptr. 75, are all distinguishable on their facts.

Under the 1998 amendment to the licensing agreement, this dollar amount was increased to $1,335,000.

The parties agreed in the licensing agreement that Michigan law would govern the agreement.

See also Restatement (Second) of Contracts §195 (1996) (“. . . a term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy”); 8 S. Williston, Contracts §19.23, at 291-97 (4th ed. 1998) (“. . . an exemption from liability for future intentional tort or crime or for a future willful or grossly negligent act is generally held void”); 6 A. Corbin, Contacts §1472, at 596-97 (1962) (“an exemption is always invalid if it applies to harm wilfully inflicted or caused by gross or wanton negligence”).

I leave open the question whether GM’s claim for breach of the implied covenant of good faith and fair dealing is covered. With respect to Count VI, claiming rescission and restitution based on a failure of consideration, in my view this count fundamentally concerns the 2000 contracts, and the limitation of remedy clause in the licensing agreement — despite its inclusive language — may simply not reach that far.

With respect to GM’s claim under Chapter 93A, insofar as GM asserts unfair or deceptive conduct based on misrepresentations or other tortious conduct, the limitation of remedy clause would not apply. See Standard Register Co. v. Bolton-Emerson, Inc., 38 Mass.App.Ct. 545, 548-50 (1995). The Chapter 93A claim is further discussed in the text below.